**FILED**

JAN - 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MS. RACHEL OQUENDO }
18726 Walter Chaalk }
Gaithersburg, MD 20886 }

MS. ANA ALGA-TORO }
18726 Waple Chaaeld }
Gaithersburg, mD 20877 }
    & }
        }
        }
MS. LINDA RUCKER }
PLANTIFF S }
18726 w/s ker Choice M }
Barthersburg, mD 20886 }

MR. PETER GREEN }
SECERARY OF THE }
ARMY }
        }
DEFENDANT }
United States Attorney }
Civil Division }
555 Forth St N. W. }
Washington DC 20530 }

12 December 2007

Case: 1:08-cv-00032
Assigned To : Walton, Reggie B.
Assign. Date : 1/7/2008
Description: Employ. Discrim.

## BACKGROUND
*Complaint*

  We three Employees come as a group from Walter Reed Army Medical Center, Medical Record Administration Division filing a Complaint of Discrimination for similar situated circumstances PROSE, we can not afford an attorney. We three Employees participated in a sexual harassment complaint, we were witnesses during the investigation. Ms. Ana Alga-Toro was the victim a male employee had kissed her toes. I Linda Rucker am the spokes person for the group, and as the Supervisor I had to sign the Letter Of Termination. Leading up to the investigation, during the investigation and after the disciplinary action Management launched a war of reprisal, creating a hostile and stressful work environment, job harassment, defaming subordinates character, religious discrimination & aggravating known medical conditions of employees  and contributing to new medical conditions. This Complaint of Discrimination is against Mrs. Julie Sherman (Chief Medical Record Administration Division GS-13) & SFC Davis Oneal (former NCOIC Medical Record Administration Division).  There is a trail of documentation that we have consistently presented to Walter Reed EEO Office which they turned a deaf ear .Further we were denied due process by Walter Reed's EEO office by using an Employees of the EEO office to do the investigation, knowing there would be a conflict of interest compromising our civil rights by not appointing a representative of

**RECEIVED**

DEC 17 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*1*

our own peers.  Medical Record Administration Division has a history of illegal and disparate treatment of Employees.  I'm constantly pressured about these two employees status. which stresses me out.  Ms. Oquendo Physicians has clearly documented her illnesses & Ms. Ana  Alga-Toro is a disabled veteran ,her medical conditions documented as well. I myself have two open Workmen's Compensation claims for Depression and Post traumatic stress disorder.

The three of us in all supporting documents collaborate each others information.  For example when the Chief of Medical Records came over with a clear bottle and sprayed something in the air and said the words "" she was going to drag the devil out of hear "which she later denied however there was another employee present. This  appeared  to be a religious ritual during this same time Mrs. Sherman had two crosses taped above her door of  the crusifix  I have been informed by Ms. Oquendo on several occasions that Ms. Sherman said " She Was going to get me"  I am uncomfortable with Ms.  Sherman saying this to a subordinate under my Supervision, I take this to be a threat.  After the group of made our complaint,  I was told by the EEO Counselor that I should know the process I have did it enough. This was an act of reprisal as well and she wrote this in e-mail This is the second time I have been to Federal Court with a Complaint of Discrimination against Walter Reeds, Medical Record Administration Division the only difference is the hand of retaliation reached pass me to two other Employees.

## SUMMARY OF THE FACTS IN EXHIBITS

---

EXHIBIT 1:  Civil rights act of 1964 Title VII ( Equal Employment Opportunities) (Prohibited Personnel Practices)

COMPLAINT OF DISCRIMINATION COMNT'

Exhibit 2: Memorandum For Walter Reed EEO Office ( Class Action complaint of Discrimination) ( Dated 4 June 2007)

Exhibit 3: Complaint Of Discrimination With The Equal Employment Commission (Dated 11/17/2007)

Exhibit: 4 Memorandum For: Director Of Equal Opportunity / Civil Rights ATTN: Deputy For EEOCR ( Dated 26 September 2007)

Exhibit 5: Witness confirming the Religious discrimination By Mrs. Julie Sherman, spraying something in a clear bottle and saying some words about "she was going to drag the devil out of here" Is that the way a GS-13 handle issues.

## SUMMARY OF THE FACTS

Exhibit 6:    As the group has documented in the above Memorandums and documents in date order below beginning in April 2007 – November 2007

Exhibit 7: Medical Documentation :

Exhibit 8: Relief : Compensatory & pugnitive damages and pain & suffering in the monetary amount of fifty thousand dollars per person

MS. RACHEL PIZZARRO-OQUENDO

*Linda Rucker For Ms. Rachel Oquendo 12/02/07*

MS. ANA ALGATORO

*Ana R Cuago-Tao 12/12/07*

MS. LINDA RUCKER

*Ms Linda Rucker 12/02/07*

IN THE UNITED ATATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

ADDRESS: LINDA RUCKER
18726 WALKER CHOICE RD. # 2
GAITHERSBURG, MD 20886

*The U.S. Equal Employment Opportunity Commission*

# Title VII of the Civil Rights Act of 1964

*EDITOR'S NOTE: The following is the text of Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352) (Title VII), as amended, as it appears in volume 42 of the United States Code, beginning at section 2000e. Title VII prohibits employment discrimination based on race, color, religion, sex and national origin. The Civil Rights Act of 1991 (Pub. L. 102-166) (CRA) amends several sections of Title VII. These amendments appear in boldface type. In addition, section 102 of the CRA (which is printed elsewhere in this publication) amends the Revised Statutes by adding a new section following section 1977 (42 U.S.C. 1981), to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the Americans with Disabilities Act of 1990, and section 501 of the Rehabilitation Act of 1973. Cross references to Title VII as enacted appear in italics following each section heading. Editor's notes also appear in italics.*

An Act

To enforce the constitutional right to vote, to confer jurisdiction upon the district courts of the United States to provide injunctive relief against discrimination in public accommodations, to authorize the attorne General to institute suits to protect constitutional rights in public facilities and public education, to extend the Commission on Civil Rights to prevent discrimination in federally assisted programs, to establish a Commission on Equal Employment Opportunity, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as th "Civil Rights Act of 1964".

        * * *

DEFINITIONS

SEC. 2000e. *[Section 701]*

For the purposes of this subchapter-

(a) The term ``person'' includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships associations, corporations, legal representatives, mutual companies, jointstock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11 *[bankruptcy]*, or receivers.

08 0032

(b) The term ``employer'' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each o twenty or more calendar weeks in the current or preceding calendar year,

FILED

JAN - 7 2008    Exh.1

12/6/2007

NANCY MAYER WHITTINGTON, CLERK

and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of title 5 [of the United States Code]), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of title 26 [the Internal Revenue Code of 1954], except that during the first year after March 24, 1972 [the date of enactment of the Equal Employment Opportunity Act of 1972], persons having fewer than twentyfive employees (and their agents) shall not be considered employers.

(c) The term ``employment agency'' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

(d) The term ``labor organization'' means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, an includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

(e) A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hirin office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twentyfive or more during the first year after March 24, 1972 [the date of enactment of the Equal Employment Opportunity Act of 1972], or (B) fifteen or more thereafter, and such labor organization-

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C. 151 et seq.], or the Railway Labor Act, as amended [45 U.S.C. 151 et seq.];

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of

employers within the meaning of paragraph (1) or (2); or

    (4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; o

    (5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

(f) The term ``employee'' means an individual employed by an employer, except that the term ``employee'' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutiona or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. **With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.**

(g) The term ``commerce'' means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

(h) The term ``industry affecting commerce'' means any activity, business or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry ``affecting commerce'' within the meaning of the LaborManagement Reporting and Disclosure Act of 1959 [29 U.S.C. 401 et seq.], and further includes any governmental industry, business, or activity.

(i) The term ``State'' includes a State of the United States, the Distric of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act [43 U.S.C. 1331 et seq.].

(j) The term ``religion'' includes all aspects of religious observance an practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(k) The terms ``because of sex'' or ``on the basis of sex'' include, but

are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employmentrelated purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title *[section 703(h)]* shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for healt insurance benefits for abortion, except where the life of the mother woul be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: Provided, That nothing herei shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

(l) The term ``complaining party'' means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

(m) The term ``demonstrates'' means meets the burdens of production and persuasion.

(n) The term ``respondent'' means an employer, employment agency, labor organization, joint labormanagement committee controlling apprenticeship or other training or retraining program, including an onthejob training program, or Federal entity subject to section 2000e-16 of this title .

EXEMPTION

SEC. 2000e-1. *[Section 702]*

(a) This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respec to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

(b) It shall not be unlawful under section 2000e-2 or 2000e-3 of this title *[section 703 or 704]* for an employer (or a corporation controlled by an employer), labor organization, employment agency, or joint labormanagement committee controlling apprenticeship or other training or retraining (including onthejob training programs) to take any action otherwise prohibited by such section, with respect to an employee in a workplace in a foreign country if compliance with such section would cause such employer (or such corporation), such organization, such agency, or such committee to violate the law of the foreign country in which such workplace is located.

(c) (1) If an employer controls a corporation whose place of incorporatio

is a foreign country, any practice prohibited by section 2000e-2 or 2000e-3 of this title [section 703 or 704] engaged in by such corporation shall be presumed to be engaged in by such employer.

(2) Sections 2000e-2 and 2000e-3 of this title [sections 703 and 704] shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

(3) For purposes of this subsection, the determination of whether an employer controls a corporation shall be based on—

(A) the interrelation of operations;

(B) the common management;

(C) the centralized control of labor relations; and

(D) the common ownership or financial control, of the employer and t corporation.

UNLAWFUL EMPLOYMENT PRACTICES

SEC. 2000e-2. [Section 703]

(a) It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion sex, or national origin.

(b) It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

(c) It shall be an unlawful employment practice for a labor organization-

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants

for membership, or to classify or fail or refuse to refer for employment
any individual, in any way which would deprive or tend to deprive any
individual of employment opportunities, or would limit such employment
opportunities or otherwise adversely affect his status as an employee or
as an applicant for employment, because of such individual's race, color,
religion, sex, or national origin; or

     (3) to cause or attempt to cause an employer to discriminate
against an individual in violation of this section.

(d) It shall be an unlawful employment practice for any employer, labor
organization, or joint labormanagement committee controlling
apprenticeship or other training or retraining, including
onthejob training programs to discriminate against any
individual because of his race, color, religion, sex, or national origin
in admission to, or employment in, any program established to provide
apprenticeship or other training.

(e) Notwithstanding any other provision of this subchapter, (1) it shall
not be an unlawful employment practice for an employer to hire and employ
employees, for an employment agency to classify, or refer for employment
any individual, for a labor organization to classify its membership or to
classify or refer for employment any individual, or for an employer, labo
organization, or joint labormanagement committee controlling
apprenticeship or other training or retraining programs to admit or emplo
any individual in any such program, on the basis of his religion, sex, or
national origin in those certain instances where religion, sex, or
national origin is a bona fide occupational qualification reasonably
necessary to the normal operation of that particular business or
enterprise, and (2) it shall not be an unlawful employment practice for a
school, college, university, or other educational institution or
institution of learning to hire and employ employees of a particular
religion if such school, college, university, or other educational
institution or institution of learning is, in whole or in substantial
part, owned, supported, controlled, or managed by a particular religion o
by a particular religious corporation, association, or society, or if the
curriculum of such school, college, university, or other educational
institution or institution of learning is directed toward the propagation
of a particular religion.

(f) As used in this subchapter, the phrase ``unlawful employment
practice'' shall not be deemed to include any action or measure taken by
an employer, labor organization, joint labormanagement committee, or
employment agency with respect to an individual who is a member of the
Communist Party of the United States or of any other organization require
to register as a Communistaction or Communistfront
organization by final order of the Subversive Activities Control Board
pursuant to the Subversive Activities Control Act of 1950 *[50 U.S.C.
781 et seq.]*.

(g) Notwithstanding any other provision of this subchapter, it shall not

be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency t fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if-

(1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of th national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

(2) such individual has not fulfilled or has ceased to fulfill that requirement.

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29 *[section 6(d) of the Fair Labor Standards Act of 1938, as amended]*.

(i) Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which preferential treatment is given to any individual because he is an Indian living on or near a reservation.

(j) Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labormanagement committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or grou on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to

membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

**(k) (1) (A) An unlawful employment practice based on disparate impact is established under this title only if—**

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basi of race, color, religion, sex, or national origin and the respondent fail to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

(B) (i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

(C) The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of ``alternative employment practice''.

(2) A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this title.

(3) Notwithstanding any other provision of this title, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act [21 U.S.C. 801 et seq.] or any other provision of Federal law, shall be considered an unlawful employment practice under this title only if such rule is adopte

or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

(1) It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests o the basis of race, color, religion, sex, or national origin.

(m) Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

(n) (1) (A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolve a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

(B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws-

(i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had-

(I) actual notice of the proposed judgment or order sufficient t apprise such person that such judgment or order might adversely affect th interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future dat certain; and

(II) a reasonable opportunity to present objections to such judgment or order; or

(ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

(2) Nothing in this subsection shall be construed to-

(A) alter the standards for intervention under rule 24 of the Federal Rules of Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

(B) apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a

class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by th Federal Government;

(C) prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

(D) authorize or permit the denial to any person of the due process of law required by the Constitution.

(3) Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to section 1404 of title 28, United States Code.

OTHER UNLAWFUL EMPLOYMENT PRACTICES

SEC. 2000e-3. [Section 704]

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labormanagement committee controlling apprenticeship or other training or retraining, including onthejob training programs, to discriminate against any individual, or for a labor organization to discriminate against any membe thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he ha made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(b) It shall be an unlawful employment practice for an employer, labor organization, employment agency, or joint labormanagement committee controlling apprenticeship or other training or retraining, including onthejob training programs, to print or publish or cause to be printed or published any notice or advertisement relating to employment b such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classificatio or referral for employment by such an employment agency, or relating to admission to, or employment in, any program established to provide apprenticeship or other training by such a joint labormanagement committee, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin, except that such a notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

SEC. 2000e-4. [Section 705]

(a) There is hereby created a Commission to be known as the Equal Employment Opportunity Commission, which shall be composed of five members, not more than three of whom shall be members of the same political party. Members of the Commission shall be appointed by the President by and with the advice and consent of the Senate for a term of five years. Any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed, and all members of the Commission shall continue to serve until their successors are appointed and qualified, except that no such member of the Commission shall continue to serve (1) for more than sixty days when the Congress is in session unless a nomination to fill such vacancy shall have been submitted to the Senate, or (2) after the adjournment sine die of the session of the Senate in which such nomination was submitted. The President shall designate one member to serve as Chairman of the Commission, and one member to serve as Vice Chairman. The Chairman shall be responsible on behalf of the Commission for the administrative operations of the Commission, and, except as provided in subsection (b) o this section, shall appoint, in accordance with the provisions of title 5 [United States Code] governing appointments in the competitive service, such officers, agents, attorneys, administrative law judges [hearing examiners], and employees as he deems necessary to assist it in the performance of its functions and to fix their compensation in accordance with the provisions of chapter 51 and subchapter III of chapte 53 of title 5 [United States Code], relating to classification and General Schedule pay rates: Provided, That assignment, removal, and compensation of administrative law judges [hearing examiners] shall be in accordance with sections 3105, 3344, 5372, and 7521 of title 5 [United States Code].

(b) (1) There shall be a General Counsel of the Commission appointed by the President, by and with the advice and consent of the Senate, for a term of four years. The General Counsel shall have responsibility for the conduct of litigation as provided in sections 2000e-5 and 2000e-6 of this title [sections 706 and 707]. The General Counsel shall have such other duties as the Commission may prescribe or as may be provided by law and shall concur with the Chairman of the Commission on the appointment and supervision of regional attorneys. The General Counsel of the Commission on the effective date of this Act shall continue in such position and perform the functions specified in this subsection until a successor is appointed and qualified.

(2) Attorneys appointed under this section may, at the direction of the Commission, appear for and represent the Commission in any case in court, provided that the Attorney General shall conduct all litigation to which the Commission is a party in the Supreme Court pursuant to this

subchapter.

(c) A vacancy in the Commission shall not impair the right of the remaining members to exercise all the powers of the Commission and three members thereof shall constitute a quorum.

(d) The Commission shall have an official seal which shall be judicially noticed.

(e) The Commission shall, at the close of each fiscal year report to the Congress and to the President concerning the action it has taken *[the names, salaries, and duties of all individuals in its employ]* and the moneys it has disbursed. It shall make such further reports on the cause of and means of eliminating discrimination and such recommendations for further legislation as may appear desirable.

(f) The principal office of the Commission shall be in or near the District of Columbia, but it may meet or exercise any or all its powers a any other place. The Commission may establish such regional or State offices as it deems necessary to accomplish the purpose of this subchapter.

(g) The Commission shall have power-

    (1) to cooperate with and, with their consent, utilize regional, State, local, and other agencies, both public and private, and individuals;

    (2) to pay to witnesses whose depositions are taken or who are summoned before the Commission or any of its agents the same witness and mileage fees as are paid to witnesses in the courts of the United States;

    (3) to furnish to persons subject to this subchapter such technical assistance as they may request to further their compliance with this subchapter or an order issued thereunder;

    (4) upon the request of (i) any employer, whose employees or some of them, or (ii) any labor organization, whose members or some of them, refuse or threaten to refuse to cooperate in effectuating the provisions of this subchapter, to assist in such effectuation by conciliation or suc other remedial action as is provided by this subchapter;

    (5) to make such technical studies as are appropriate to effectuate the purposes and policies of this subchapter and to make the results of such studies available to the public;

    (6) to intervene in a civil action brought under section 2000e-5 of this title *[section 706]* by an aggrieved party against a respondent other than a government, governmental agency or political subdivision.

(h) **(1)** The Commission shall, in any of its educational or

promotional activities, cooperate with other departments and agencies in the performance of such educational and promotional activities.

**(2) In exercising its powers under this title, the Commission shall carry out educational and outreach activities (including dissemination of information in languages other than English) targeted to-**

**(A) individuals who historically have been victims of employment discrimination and have not been equitably served by the Commission; and**

**(B) individuals on whose behalf the Commission has authority to enforce any other law prohibiting employment discrimination, concerning rights and obligations under this title or such law, as the case may be.**

(i) All officers, agents, attorneys, and employees of the Commission shall be subject to the provisions of section 7324 of title 5 *[section 9 of the Act of August 2, 1939, as amended (the Hatch Act)]*, notwithstanding any exemption contained in such section.

**(j) (1) The Commission shall establish a Technical Assistance Training Institute, through which the Commission shall provide technical assistanc and training regarding the laws and regulations enforced by the Commission.**

**(2) An employer or other entity covered under this title shall not be excused from compliance with the requirements of this title because of any failure to receive technical assistance under this subsection.**

**(3) There are authorized to be appropriated to carry out this subsection such sums as may be necessary for fiscal year 1992.**

ENFORCEMENT PROVISIONS

SEC. 2000e-5. *[Section 706]*

(a) The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e-2 or 2000e-3 of this title *[section 703 or 704]*.

(b) Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labormanagement committee controlling apprenticeship or other training or retraining, including onthejob training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labormanagement committee (hereinafter referred to as the ``respondent'') within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or

affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d of this section. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees or used as evidence in a subsequent proceeding without the written consen of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filin of the charge or, where applicable under subsection (c) or (d) of this section, from the date upon which the Commission is authorized to take action with respect to the charge.

(c) In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local la prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unles such proceedings have been earlier terminated, provided that such sixtyday period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

(d) In the case of any charge filed by a member of the Commission allegin an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request

afford them a reasonable time, but not less than sixty days (provided tha such sixtyday period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged.

(e) **(1)** A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be serve upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceeding with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a cop of such charge shall be filed by the Commission with the State or local agency.

**(2) For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this title (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.**

(f) (1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or politica subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, o political subdivision. If a charge filed with the Commission pursuant to subsection (b) of this section, is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this

section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action i a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or th Attorney General in a case involving a government, governmental agency, o political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene i such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsection (c) or (d) of this section o further efforts of the Commission to obtain voluntary compliance.

(2) Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 6 of the Federal Rules of Civil Procedure. It shall be the duty of a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to b in every way expedited.

(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employmen practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28 [of the United States Code], the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

(4) It shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shal then designate a district or circuit judge of the circuit to hear and determine the case.

(5) It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable dat and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 5 of the Federal Rules of Civil Procedure.

(g) **(1)** If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practic charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable b the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charg with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

**(2) (A)** No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title *[section 704(a)]*.

**(B) On a claim in which an individual proves a violation under section 2000e-2(m) of this title *[section 703(m)]* and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court-**

**(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to b directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title *[section 703(m)]*; and**

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

(h) The provisions of chapter 6 of title 29 [the Act entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes," approved March 23, 1932 (29 U.S.C. 105-115)] shall not apply with respect to civil actions brought under this section.

(i) In any case in which an employer, employment agency, or labor organization fails to comply with an order of a court issued in a civil action brought under this section, the Commission may commence proceeding to compel compliance with such order.

(j) Any civil action brought under this section and any proceedings brought under subsection (i) of this section shall be subject to appeal a provided in sections 1291 and 1292, title 28 [United States Code].

(k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

CIVIL ACTIONS BY THE ATTORNEY GENERAL

SEC. 2000e-6. [Section 707]

(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by hi (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsibl for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

(b) The district courts of the United States shall have and shall exercis jurisdiction of proceedings instituted pursuant to this section, and in any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a

threejudge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judg of the circuit) in which the case is pending. Upon receipt of such reques it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and anothe of whom shall be a district judge of the court in which the proceeding wa instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In the event the Attorney General fails to file such a request in any suc proceeding, it shall be the duty of the chief judge of the district (or i his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shal then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

(c) Effective two years after March 24, 1972 *[the date of enactment of the Equal Employment Opportunity Act of 1972]*, the functions of the Attorney General under this section shall be transferred to the Commission, together with such personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available, or to be made available in connection with such functions unless the President submits, and neither House of Congress vetoes, a reorganization plan pursuant to chapter 9 of title 5 *[United States Code]*, inconsistent with the provisions of this subsection. The Commission shall carry out such functions in accordance with subsections (d) and (e) of this section.

(d) Upon the transfer of functions provided for in subsection (c) of this section, in all suits commenced pursuant to this section prior to the dat of such transfer, proceedings shall continue without abatement, all court orders and decrees shall remain in effect, and the Commission shall be substituted as a party for the United States of America, the Attorney General, or the Acting Attorney General, as appropriate.

(e) Subsequent to March 24, 1972 *[the date of enactment of the Equal Employment Opportunity Act of 1972]*, the Commission shall have authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be

aggrieved or by a member of the Commission. All such actions shall be
conducted in accordance with the procedures set forth in section 2000e-5
of this title [section 706].


EFFECT ON STATE LAWS

SEC. 2000e-7. [Section 708]

Nothing in this subchapter shall be deemed to exempt or relieve any
person from any liability, duty, penalty, or punishment provided by any
present or future law of any State or political subdivision of a State,
other than any such law which purports to require or permit the doing of
any act which would be an unlawful employment practice under this
subchapter.


INVESTIGATIONS, INSPECTIONS, RECORDS, STATE AGENCIES

SEC. 2000e-8. [Section 709]

(a) In connection with any investigation of a charge filed under
section 2000e-5 of this title [section 706], the Commission or its
designated representative shall at all reasonable times have access to,
for the purposes of examination, and the right to copy any evidence of an
person being investigated or proceeded against that relates to unlawful
employment practices covered by this subchapter and is relevant to the
charge under investigation.

(b) The Commission may cooperate with State and local agencies charged
with the administration of State fair employment practices laws and, with
the consent of such agencies, may, for the purpose of carrying out its
functions and duties under this subchapter and within the limitation of
funds appropriated specifically for such purpose, engage in and contribut
to the cost of research and other projects of mutual interest undertaken
by such agencies, and utilize the services of such agencies and their
employees, and, notwithstanding any other provision of law, pay by advanc
or reimbursement such agencies and their employees for services rendered
to assist the Commission in carrying out this subchapter. In furtherance
of such cooperative efforts, the Commission may enter into written
agreements with such State or local agencies and such agreements may
include provisions under which the Commission shall refrain from
processing a charge in any cases or class of cases specified in such
agreements or under which the Commission shall relieve any person or clas
of persons in such State or locality from requirements imposed under this
section. The Commission shall rescind any such agreement whenever it
determines that the agreement no longer serves the interest of effective
enforcement of this subchapter.

(c) Every employer, employment agency, and labor organization subject to
this subchapter shall (1) make and keep such records relevant to the

determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder. The Commission shall, by regulation, require each employer, labor organization, and joint labormanagement committee subject to this subchapter which controls an apprenticeship or other training progra to maintain such records as are reasonably necessary to carry out the purposes of this subchapter, including, but not limited to, a list of applicants who wish to participate in such program, including the chronological order in which applications were received, and to furnish t the Commission upon request, a detailed description of the manner in whic persons are selected to participate in the apprenticeship or other training program. Any employer, employment agency, labor organization, or joint labormanagement committee which believes that the application to it of any regulation or order issued under this section would result i undue hardship may apply to the Commission for an exemption from the application of such regulation or order, and, if such application for an exemption is denied, bring a civil action in the United States district court for the district where such records are kept. If the Commission or the court, as the case may be, finds that the application of the regulation or order to the employer, employment agency, or labor organization in question would impose an undue hardship, the Commission o the court, as the case may be, may grant appropriate relief. If any perso required to comply with the provisions of this subsection fails or refuse to do so, the United States district court for the district in which such person is found, resides, or transacts business, shall, upon application of the Commission, or the Attorney General in a case involving a government, governmental agency or political subdivision, have jurisdiction to issue to such person an order requiring him to comply.

(d) In prescribing requirements pursuant to subsection (c) of this section, the Commission shall consult with other interested State and Federal agencies and shall endeavor to coordinate its requirements with those adopted by such agencies. The Commission shall furnish upon request and without cost to any State or local agency charged with the administration of a fair employment practice law information obtained pursuant to subsection (c) of this section from any employer, employment agency, labor organization, or joint labormanagement committee subject to the jurisdiction of such agency. Such information shall be furnished on condition that it not be made public by the recipient agency prior to the institution of a proceeding under State or local law involving such information. If this condition is violated by a recipient agency, the Commission may decline to honor subsequent requests pursuant to this subsection.

(e) It shall be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such

information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty, of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year

## INVESTIGATORY POWERS

SEC. 2000e-9. *[Section 710]*

For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section 161 of titl 29 *[section 11 of the National Labor Relations Act]* shall apply.

## POSTING OF NOTICES; PENALTIES

SEC. 2000e-10. *[Section 711]*

(a) Every employer, employment agency, and labor organization, as the case may be, shall post and keep posted in conspicuous places upon its premises where notices to employees, applicants for employment, and members are customarily posted a notice to be prepared or approved by the Commission setting forth excerpts, from or, summaries of, the pertinent provisions of this subchapter and information pertinent to the filing of complaint.

(b) A willful violation of this section shall be punishable by a fine of not more than $100 for each separate offense.

## VETERANS' SPECIAL RIGHTS OR PREFERENCE

SEC. 2000e-11. *[Section 712]*

Nothing contained in this subchapter shall be construed to repeal or modify any Federal, State, territorial, or local law creating special rights or preference for veterans.

## RULES AND REGULATIONS

SEC. 2000e-12. *[Section 713]*

(a) The Commission shall have authority from time to time to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter. Regulations issued under this section shal be in conformity with the standards and limitations of subchapter II of chapter 5 of title 5 *[the Administrative Procedure Act]*.

(b) In any action or proceeding based on any alleged unlawful employment

practice, no person shall be subject to any liability or punishment for o on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission, or (2) the failure of such person to publish and file any information required by any provision of this subchapter if he pleads and proves that he failed to publish and fil such information in good faith, in conformity with the instructions of th Commission issued under this subchapter regarding the filing of such information. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that (A) after such act or omission, such interpretation or opinion is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect, or (B) after publishing or filing the description and annual reports, such publication or filing is determined by judicial authority not to be in conformity wit the requirements of this subchapter.


FORCIBLY RESISTING THE COMMISSION OR ITS REPRESENTATIVES

SEC. 2000e-13. *[Section 714]*

The provisions of sections 111 and 1114, title 18 *[United States Code]*, shall apply to officers, agents, and employees of the Commission in the performance of their official duties. Notwithstanding the provisions of sections 111 and 1114 of title 18 *[United States Code]*, whoever in violation of the provisions of section 1114 of such title kills a person while engaged in or on account of the performance of his official functions under this Act shall be punished by imprisonment for any term of years or for life.


*TRANSFER OF AUTHORITY*

*[Administration of the duties of the Equal Employment Opportunity Coordinating Council was transferred to the Equal Employment Opportunity Commission effective July 1, 1978, under the President's Reorganization Plan of 1978.]*


EQUAL EMPLOYMENT OPPORTUNITY COORDINATING COUNCIL

SEC. 2000e-14. *[Section 715]*

*[There shall be established an Equal Employment Opportunity Coordinating Council (hereinafter referred to in this section as the Council) composed of the Secretary of Labor, the Chairman of the Equal Employment Opportunity Commission, the Attorney General, the Chairman of the United States Civil Service Commission, and the Chairman of the United States*

*Civil Rights Commission, or their respective delegates.]*

The Equal Employment Opportunity Commission *[Council]* shall have the responsibility for developing and implementing agreements, policies and practices designed to maximize effort, promote efficiency, and eliminate conflict, competition, duplication and inconsistency among the operations, functions and jurisdictions of the various departments, agencies and branches of the Federal Government responsible for the implementation and enforcement of equal employment opportunity legislation, orders, and policies. On or before October 1 *[July 1]* of each year, the Equal Employment Opportunity Commission *[Council]* shall transmit to the President and to the Congress a report of its activities, together with such recommendations for legislative or administrative changes as it concludes are desirable to further promote the purposes of this section.


EFFECTIVE DATE

SEC. 2000e-15. *[Section 716]*

*[(a) This title shall become effective one year after the date of its enactment.*

*(b) Notwithstanding subsection (a), sections of this title other than sections 703, 704, 706, and 707 shall become effective immediately.*

*(c)]* The President shall, as soon as feasible after July 2, 1964 *[the enactment of this title]*, convene one or more conferences for the purpose of enabling the leaders of groups whose members will be affected by this subchapter to become familiar with the rights afforded and obligations imposed by its provisions, and for the purpose of making plans which will result in the fair and effective administration of this subchapter when all of its provisions become effective. The President shall invite the participation in such conference or conferences of (1) the members of the President's Committee on Equal Employment Opportunity, (2) the members of the Commission on Civil Rights, (3) representatives of State and local agencies engaged in furthering equal employment opportunity, (4) representatives of private agencies engaged in furthering equal employment opportunity, and (5) representatives of employers, labor organizations, and employment agencies who will be subject to this subchapter.


TRANSFER OF AUTHORITY

*[Enforcement of Section 717 was transferred to the Equal Employment Opportunity Commission from the Civil Service Commission (Office of Personnel Management) effective January 1, 1979 under the President's Reorganization Plan No. 1 of 1978.]*

EMPLOYMENT BY FEDERAL GOVERNMENT

SEC. 2000e-16. [Section 717]

(a) All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5 [United States Code], in executive agencies [other than the General Accounting Office] as defined in section 105 of title 5 [United States Code] (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia having positions in the competitiv service, and in those units of the legislative and judicial branches of the Federal Government having positions in the competitive service, and i the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin.

(b) Except as otherwise provided in this subsection, the Equal Employment Opportunity Commission [Civil Service Commission] shall have authority to enforce the provisions of subsection (a) of this section through appropriate remedies, including reinstatement or hiring of employees with or without back pay, as will effectuate the policies of this section, and shall issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section. The Equal Employment Opportunity Commission [Civil Service Commission] shall-

    (1) be responsible for the annual review and approval of a national and regional equal employment opportunity plan which each department and agency and each appropriate unit referred to in subsection (a) of this section shall submit in order to maintain an affirmative program of equal employment opportunity for all such employees and applicants for employment;

    (2) be responsible for the review and evaluation of the operation of all agency equal employment opportunity programs, periodically obtaining and publishing (on at least a semiannual basis) progress report from each such department, agency, or unit; and

    (3) consult with and solicit the recommendations of interested individuals, groups, and organizations relating to equal employment opportunity.

The head of each such department, agency, or unit shall comply with such rules, regulations, orders, and instructions which shall include a provision that an employee or applicant for employment shall be notified of any final action taken on any complaint of discrimination filed by him thereunder. The plan submitted by each department, agency, and unit shall

include, but not be limited to-

     (1) provision for the establishment of training and education
programs designed to provide a maximum opportunity for employees to
advance so as to perform at their highest potential; and

     (2) a description of the qualifications in terms of training and
experience relating to equal employment opportunity for the principal and
operating officials of each such department, agency, or unit responsible
for carrying out the equal employment opportunity program and of the
allocation of personnel and resources proposed by such department, agency
or unit to carry out its equal employment opportunity program.

With respect to employment in the Library of Congress, authorities grante
in this subsection to the Equal Employment Opportunity Commission
[Civil Service Commission] shall be exercised by the Librarian of
Congress.

(c) Within **90 days** of receipt of notice of final action taken by a
department, agency, or unit referred to in subsection (a) of this section
or by the Equal Employment Opportunity Commission [Civil Service
Commission] upon an appeal from a decision or order of such
department, agency, or unit on a complaint of discrimination based on
race, color, religion, sex or national origin, brought pursuant to
subsection (a) of this section, Executive Order 11478 or any succeeding
Executive orders, or after one hundred and eighty days from the filing of
the initial charge with the department, agency, or unit or with the Equal
Employment Opportunity Commission [Civil Service Commission] on
appeal from a decision or order of such department, agency, or unit until
such time as final action may be taken by a department, agency, or unit,
an employee or applicant for employment, if aggrieved by the final
disposition of his complaint, or by the failure to take final action on
his complaint, may file a civil action as provided in section 2000e-5 of
this title [section 706], in which civil action the head of the
department, agency, or unit, as appropriate, shall be the defendant.

(d) The provisions of section 2000e-5(f) through (k) of this title
[section 706(f) through (k)], as applicable, shall govern civil
actions brought hereunder, **and the same interest to compensate for
delay in payment shall be available as in cases involving nonpublic
parties.**

(e) Nothing contained in this Act shall relieve any Government agency
or official of its or his primary responsibility to assure
nondiscrimination in employment as required by the Constitution and
statutes or of its or his responsibilities under Executive Order 11478
relating to equal employment opportunity in the Federal Government.


SPECIAL PROVISIONS WITH RESPECT TO DENIAL, TERMINATION, AND

SUSPENSION OF GOVERNMENT CONTRACTS

SEC. 2000e-17. *[Section 718]*

No Government contract, or portion thereof, with any employer, shall
be denied, withheld, terminated, or suspended, by any agency or officer o
the United States under any equal employment opportunity law or order,
where such employer has an affirmative action plan which has previously
been accepted by the Government for the same facility within the past
twelve months without first according such employer full hearing and
adjudication under the provisions of section 554 of title 5 *[United
States Code]*, and the following pertinent sections:  Provided, That if
such employer has deviated substantially from such previously agreed to
affirmative action plan, this section shall not apply:  Provided further,
That for the purposes of this section an affirmative action plan shall be
deemed to have been accepted by the Government at the time the appropriat
compliance agency has accepted such plan unless within fortyfive
days thereafter the Office of Federal Contract Compliance has disapproved
such plan.

---

*This page was last modified on January 15, 1997.*

 **Return to Home Page**

MCHL-PAD-MR

4 June 2007

2007 JUN -5 PM 2: 35

Memorandum For: WRAMC EEO Office.

SUBJECT: Class Action Complaint Of Discrimination For: Reprisal For participating In A Complaint Of Sexual Harassment, Abuse Of authority, Intimidation, Job Harassment, Undermining the Supervisor's Authourity & Creating a Hostile Work Environment and Aggravating Known Medical Conditions Of Subordinate Employees, Harassing the Supervisor Over False Information About Mrs. Pizarro's Attendance, A Class Action Complaint Is Being filed Against SFC Davis O' neal (NCOIC MRAD)

1. This former employee named in a complaint of sexual harassment had developed an unusual close relationship with SFC Davis & SFC Mcknight. I think his intentions were he would have protection against his inappropriate behavior. In fact a number of employees became angry after the employee informed them of the complaint.

2. Since the sexual harassment complaint against Mr. Cornell James and then the termination of the employee. Mrs. Rachael Pizarro, Mrs. Ana ``Alago-Toro & Mrs. Linda Rucker, we have endured undue retaliation, abuse of authority, which at this point is effecting, our health and the office environment. Mrs. Sherman (Chief of MRAD) & MSG Smith (NCOIC PAD ) have been notified of SFC Davis conduct, Mrs. Sherman did however call a meeting and SFC Davis did not show up.

3. Mcknight told me it was pretty gruddy what we did to that employee. Since the complaint he has been very visible in the section some times alone or with SFC Davis even though SFC Mcknight no longer work in the area. This has made the three of us feel intimidated from both SFC Davis & SFC Mcknight. We were informed either SFC Davis or SFC Mcknight were trying to bring the employees back contract, which would make us more uncomfortable. We were under the impression that it's zero tolerance for sexual harassment and that we were participating in protected activity which has not been the case.

4. Most of the incidents we are making a complaint about has been done in the presence of Staff so there are witnesses. After calling this matter to the attention of EEO we expect more retaliation. We should be protected against any further reprisal and the Director of PAD should be notified, no one should have to work under these type conditions.

5. Please see attachments.

08 0032
FILED

JAN - 7 2008

Exh. 2

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**CLASS ACTION COMPLAINT CONT'**          2007 JUN -5 PM 2: 35

1.  Mrs. Rachel Pizarro *[signature]*  6-4-07

2.  Mrs. Ana Alga-Toro *[signature]*  / 6-4-07

3.  Mrs.  Linda Rucker *[signature]*  6/4/07

**EQUAL EMPLOYMENT COMMISION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Ms. Rachel Pizarro-Oquendo  } | |
| } | |
| } | |
| Ms. Ana Alga-Toro  } | **COMPLAINT OF DISCRIMINATION** |
| } | |
| &amp;  } | 11\17\07 |
| Ms. Linda Rucker  ] | |
| VS  } | |
| Mr. Peter Green, Secretary Of  } | |
| The Army  } | |

*Co,*
*l*
*k*

    Complaint of discrimination against SFC Davis Oneal former NCOIC Medical Record Administration Division (MRAD)Walter Reed Army Medical Center & Mrs. Julie Sherman (Chief Medical Records Administration Division) Walter Reed Army Medical Center) Medical Record Division at Walter Reed Army Medical Center has a history of illegal treatment of employees.

    Ms. Rachel Pizarro-Oquendo, Ms Ana Alga-Toro & my self Linda Rucker spokes- person for the group. The three of us participated in a sexual harassment complaint, which the three of us were witnesses and Ms. Ana Alga-Toro was the victim and I myself Linda Rucker had to sign the termination letter. Within the time frame leading up to termination during the investigation Management began their cruel retaliation even though we were participating in protected activity.

    There were accusations of me giving these two employees leave time. The former Employee that kissed Ms. Alga-Toro's foot had developed a close relationship with Management. There were rumors that she could have prevented this incident and this is how our basis of discrimination was initiated when basically they told us at that point we were being watched.

    On 5 June 2007 the three of us contacted EEO as a group to file a discrimination complaint of reprisal, job harassment, religious discrimination, defaming subordinates character, creating a hostile and stressful work environment, inimidation and aggravating known mental medical conditions of employees.

    Please note the three of us contacted EEO on 5 June 2005 on 9 June 2007 obviously EEO contacted Management and 9 June everything blew up in to a big confrontation. The morning of 9 June 2007 SFC Davis Oneal sent me Linda Rucker an e-mail as the Supervisor questioning Mrs. Rachel's time even though she had received the same e-mail. I replied by saying SFC are you trying to entrap me. At that time I called Ms Oquendo in to the office and showed her that the time of the

Exh.3

computer and the time she wrote in response were different times. A short time later SFC Davis Oneal came over to the office.
She asked the employee about her time instead of speaking to me reference to the employee. The employee felt she was being singled out and she called to SFC Davis attention that Outpatient Staff come in at the same time as her without supervision at that time SFC Davis opened the door and asked the employees in Outpatient records do they come in without supervision which created animosity and a hostile work environment. SFC Davis then closed the door and she continued to intimidate and provoke the employee in to a confrontation. At that time the employee tried to leave the office and SFC Davis pushed on the door to keep her from leaving, I was trying to calm both their voices, Ms. Oquendo finally went to the chief's office Mrs. Julie Sherman  to try to resolve the issue the confrontation continued an employee finally lead Ms. Oquendo out side and SFC Davis Oneal had to be held back by Mrs. Sherman. This same day after all the confusion Ms. Julie Sherman would come over to the office and spray something from a clear bottle using the words 'she was going to drag the devil out of here" during this same time I noticed two crosses of the crusifix taped above her door. Mrs. Sherman denies this happened however there was another employee that witnessed her actions. I believe this religious act was intentional against the three of us with the EEO complaint. Finally is this the way a Chief GS-13 resolve issues. We are still in shock that a person of her standing did this.

After this incident we contacted one of the best labor lawyers in the business Passman & Kaplan for a paid consultation. We were then informed by Mr. Passman himself we could file as a group since the circumstances are similarly situated.

I would like the to mention as well that The EEO counselor that works for the Walter Reeds EEO office, I think she was bias and we requested an investigation by one of our own peers so that we would get fair treatment. This same EEO counselor mentioned the fact that I Linda Rucker was involved in prior EEO activity, by saying " I should know what the process is I did it enough". Ms. Tammi Brown an EEO counselor should not make this type of comment her actions demonstrate more retaliation for participating in prior EEO activity.

The trail of documentation and witnesses will be presented at the hearing.

*08 0032*

## What We Are Seeking

Compensatory and pugnitive damages of fifty thousand per person, for defaming characters and reprisal of subordinate employees participating protected activity creating a stressful and hostile work environment and practicing religious rituals while on duty as a federal employee.

**FILED**

JAN - 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*For Mrs Rachel Pizarro-Oquendo*

**Ms. Rachel Pizarro-Oquendo**


**Ms. Ana Alga-Toro.**

**Ms. Linda Rucker**

MCHL-PAD-MR                                    26 September 2007

MEMORANDUM FOR: Director Of Equal Employment Opportunity/Civil Rights
ATTNN: Deputy For EEOCCR (SAMR-EO-CCR)

SUBJECT: Reference To Unfair Practices By The Walter Reed To Assure Employees
Are given Fair And Due Process (Using An Employee Of The EEO Office To Investigate
A Complaint, Knowing There Would Be Conflict Of Interest About The Facts &
Compromising Our Civil Rights By Not Appointing A Representative Of Our Own
Peers

*Exhibit 1*

   Two Employees and myself made contact with Walter Reed EEO Office reference to
Reprisal and Creating A Hostile work environment and religious discrimination.   The
process has not been treated fair.  The victim of the sexual harassment complaint was
made to feel badly as if she had done something wrong Managers and other Employees
was looking at her differently which was a very stressful time for her.  I informed the
employees I would support her not to worry about what everyone was saying.  This
is how the complaint  this is how the complaint evolved.  Mrs. Rachel Pizarro-Oquendo
and myself Linda Rucker were witnesses and I as the Supervisor I had to sign his
termination. Mr. James had established a close Relationship With Management their
retaliation became worst after the employee was terminated

   The environment continues to be hostile and the Chief Of Medical Records really
added to the situation when she came into CRM section sprayed something from a clear
bottle stating the words that she was going to "Drag the devil out of here" The GS-13
Chief Of Medical Records Mrs. Julie Sherman had two crosses over her office door as
well.  This same person called me a Liar seven or eight times in the presence do SFC
Arringdale which was inappropriate & unprofessional.  This same Manager made an
untrue accusation saying I was making it hard for Mrs. Rachel in EEO counselors report
 I was making it hard for Mrs. Rachel also stating the employee asked her for a transfer
When whenever I went to her office to complain about SFC Davis Mrs. Sherman asked
her if she wanted to transfer

   SFC Davis the other Manager named in the complaint with her harassment of me about
the employees, undermining me as the Supervisor she had total lack of respect for me.
The incident when  SFC Davis was arguing with Mrs. Rachel and Mrs. Sherman had to
hold her back  to keep her from attacking Mrs. Rachel.  It's on this same day Mrs.
Sherman sprayed a liquid from a clear bottle in air stating the words used in the above
paragraph.  Even though Mrs. Sherman denies what she did to the EEO counselor there
was myself Linda Rucker another employee present.

08  0032
**FILED**

JAN - 7 2008

**NANCY MAYER WHITTINGTON, CLERK**
**U.S. DISTRICT COURT**

Exh. 4

The three of us has been fearful of our surroundings since making the complaint
Our belief is that she was practicing some religious ritual. Subordinate employees should not have to be subjected to such religious practices. Now everyone is turning around their information around even the EEO counselor.

In conclusion the agency need to investigate our complaint with one of our own peers. We should be able to file our complaint as a group because our complaint similarly situated. This has aggravated medical conditions and created new medical conditions. for the three us all because we participated in protected activity asexual harassment complaint.

Mrs. Rachel Pizarro –Oquenodo

Mrs. Ana Alga-Toro

Mrs. Linda Rucker

MCHL-PAD-MR

7 June 2007

MEMORANDUM FOR RECORD:  Reference To Incident That Occurred In CRM

   I was the Employee present in the office when Mrs. Julie Sherman , chief of Medical Record Administration  Division,  did in fact come over to the Clinical Record Management Section and spray something from a clear bottle saying the words "she was going to drag the devil out of hear".   I was shocked and I still am I can't believe she did that.  I did inform other employees what had happened.  Ms. Rucker was shocked as well.

AFRAID OF REPRISAL

Exh. 5

12 DECEMBER 2007

MEDICAL DOCUMENTATION FROM THE GROUP

&

RELIEF EXPECTED BY THE GROUP

08 0032

**FILED**

JAN - 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exh. 6

MCHL-PAD-MR                                    6 August 2007

SUBJECT: Attendance & Mental Stress

Dear Mrs. Rucker,

    I wanted to take this opportunity to explain my mental condition during the past few months after making a sexual harassment complaint, I have not been myself. I have been very stressed over the environment it created and consequently it has effected my attendance I,I was the victim here. I will go and talk with the Workmen's Compensation office today.

    I would ask that you work with me hopefully I will start to feel more comfortable and improve on my attendance.

Thank you for your help Mrs. Rucker I really appreciate all you have done for me.


Mrs. Ana Algo-Toro
MRT,
CRM

**Certification of Health Care Provider**
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division

Alago - Toro    7725

~~(When completed, this form goes to the employee, Not to the Department of Labor.)~~

OMB No.: 1215-0181
Expires: 08-31-2007

**1. Employee's Name**

Ana R. Alago-Toro

**2. Patient's Name** *(If different from employee)*

3. Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) __4__    (2) _____    (3) _____    (4) _____    (5) _____    (6) _____ , or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

① patient has asthma + migraines
which need periodic clinic
and home care

5. a. State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

she has had conditions from
before I met her. they present
intermittent symptoms for several
hours to several days

b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

yes

If yes, give the probable duration:

unknown

c. If the condition is a **chronic condition** (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]:

she is not incapacitated
presently

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

6.  a.  If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

patient has appointments at VA medical center for evaluation

b.  If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

she has neurology eval (EMG) has been referred to gastroenterology

c.  If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

* prescription drugs (midrin) for migraines
* inhalers for asthma

7.  a.  If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

it depends on symptoms

b.  If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

see a

c.  If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment**?

yes if for appointments

8. a. If leave is required to **care for a family member** of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

_Signature of Health Care Provider_

Type of Practice    I nternal Med-

50 (RUING ST NW)
_Address_

WASH. DC 20422

202 7458546
Telephone Number

- 2   09/25/4
Date

---

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_Employee Signature_    Date

A "Serious Health Condition" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   ~~Inpatient care (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of~~ incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

   (1) **Treatment**[3] **two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, ~~or by a provider of health care services (*e.g.*, physical therapist)~~ under orders of, or on referral by, a health care provider; or

   (2) **Treatment** by a health care provider on **at least one occasion** which results in a **regimen of continuing treatment**[4] under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

   A **chronic condition** which:

   (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

   (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

   (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of **incapacity**[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be **under the continuing supervision of, but need not be receiving active treatment by, a health care provider.** Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, **or** for a condition that **would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

---

**Public Burden Statement**

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

*DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.*

*U.S. GPO: 2000-461-954/25505

**Certification of Health Care Provider**
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



*(When completed, this form goes to the employee, **Not to the Department of Labor**.)*

| OMB No.: 1215-0181 |
| Expires: 08-31-2007 |

**1. Employee's Name**

RACHEL PIZARRO-DOVENTO

**2. Patient's Name** *(If different from employee)*

**3.** Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the   categories described? If so, please check the applicable category.

(1)_____  (2) _____  (3) _____  (-4)  ✓  (5) _____  (6) _____ , or None of the above _____

**4.** Describe the **medical facts** which support   your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

Pt has fibromyalgic condition, chronic cervicalgia, thoracolumbalgia due to Scoliosis, (B)shoulder pain due to rotator cuff tendinopathy. cd Chronic pain cause depression and anxiety disorder.

**5. a.** State the approximate **date** the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

Pt was diagnosed with fibromyalgia since 1990, this is an life long painful condition

**b.** Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

Yes.

If yes, give the probable duration:

three to five days off with each exacerbated condition

**c.** If the condition is a **chronic condition**   (condition #4) or **pregnancy**, state whether the patient is presently incapacitated[2] and the likely duration and frequency o f **episodes of incapacity**[2]:

Yes, one to two weeks.

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

6. a. If additional **treatments** will be required for the condition, provide an estimate of the probable number of such treatments.

Monthly Fu for medical treatment, 2 termittently Physical therapy depending on severity of Pain and follow by Psychiatrist for depression, anxiety dlo

If the patient will be absent from work or other daily activities because of **treatment** on an **intermittent** or **part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

b. If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

- Psychiatrist for depression, anxiety disorder
- 2 termittent Physical Therapy.

c. If a regimen of **continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

- Pain medication, anti depressants, Muscle relaxant
- and physical therapy to ↓ pain / m. spasm

7. a. If medical leave is required for the employee's **absence from work** because of the **employee's own condition** (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work** of any kind?

Yes.

b. If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

no above shoulder activities, no lifting more than 05 lbs intermittently, no twisting or bending
(five)

c. If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment**?

8. a. If leave is required to **care for a family** member of the employee with a serious health condition, **does the patient require assistance** for basic medical or personal needs or safety, or for transportation?

N/A

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

N/A

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

N/A

_____    Physical Med & Rehab
Signature of Health Care Provider      Type of Practice

2101 medical Park Dr, suite 207      301 - 681 - 5577
Address                               Telephone Number

Silver Spring, MD 20902               9-14-07
                                      Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____    9-24-07
Employee Signature                    Date

A "**Serious Health Condition**" means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   **Inpatient care** (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

   (1) **Treatment[3] two or more times by** a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

   (2) **Treatment by a health care provider on at least one occasion** which results in a **regimen of continuing treatment[4]** under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for **prenatal care**.

4. Chronic Conditions Requiring Treatments

   **A chronic condition which:**

   (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

   (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

   (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of **incapacity**[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be under **the continuing supervision of, but need not be receiving active treatment by, a health care provider**. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, **or** for a condition that **would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

---

**Public Burden Statement**

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

*DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.*

*U.S. GPO: 2000-461-954/25505

GHISLAINE FOUGY, M.D., P.A.

ADULT AND ADOLESCENT PSYCHIATRY

10230 NEW HAMPSHIRE AVENUE, SUITE 202
SILVER SPRING, MARYLAND 20903

TELEPHONE (301) 431-2500
FAX (301) 439-5927

To Whom It May Concern:

    This is to advise that Mrs. Rachel Pizarro-Oquendo who is under my care is unable to attend work for the next two weeks due to illness. She may be able to return on Wednesday, September 19, 2007.

Ghislaine Fougy, M.D.

## Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | 2. Employee or Social Security Number |
|---|---|
| Pizarro-Ovendo, Rachel | 3811 |

3. Organization

WRANC

| 4. | Type of Leave/Absence | | | | | 5. Family and Medical Leave |
|---|---|---|---|---|---|---|

| Check appropriate box(es) and enter date and time below | Date | | Time | | Total Hours | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993 (FMLA), please provide the following information: |
|---|---|---|---|---|---|---|
| | From | To | From | To | | |
| ☐ Accrued annual leave | | | | | | |
| ☐ Restored annual leave | | | | | | ☒ I hereby invoke my entitlement to family and medical leave for: |
| ☐ Advanced annual leave | | | | | | |
| ☐ Accrued sick leave | | | | | | ☐ Birth/Adoption/Foster Care |
| ☐ Advanced sick leave | | - | | | | |
| Purpose: ☑ Illness/injury/incapacitation of requesting employee | | | | | | ☐ Serious health condition of spouse, son, daughter, or parent |
| ☑ Medical/dental/optical examination of requesting employee | | | | | | |
| ☐ Care of family member, including medical/dental/optical examination of family member or bereavement | | | | | | ☒ Serious health condition of self |
| ☐ Care of family member with a serious health condition | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the FMLA. Medical certification of a serious health condition may be required by your agency. |
| ☐ Other | | | | | | |
| ☐ Compensatory time off | | | | | | |
| ☐ Other paid absence (specify in remarks) | | | | | | |
| ☐ Leave without pay | | | | | | |

6. Remarks

under Doctor's care for emotional + physical reasons.

7. **Certification:** I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| 7a. Employee signature | 7b. Date signed |
|---|---|
| Rachel Pizarro Ogando | 8-24-07 |

| 8a. Official action on request | ☐ Approved ☐ Disapproved | (If disapproved, give reason. If annual leave, initiate action to reschedule.) |
|---|---|---|

8b. Reason for disapproval

| 8c. Signature | 8d. Date signed |
|---|---|

**Privacy Act Statement**

**Section 6311** of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

**Public Law 104-134** (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| Office of Personnel Management CFR 630 | Local Reproduction Authorized | OPM Form 71 June 2001 Formerly Standard Form (SF) 71 USAPA V3.00ES |
|---|---|---|

### GHISLAINE FOUGY, M.D., P.A.

#### ADULT AND ADOLESCENT PSYCHIATRY

10230 NEW HAMPSHIRE AVENUE, SUITE 202
SILVER SPRING, MARYLAND 20903

TELEPHONE (301) 431-2500
FAX (301) 439-5927

October 09, 2007

Re:    Rachel Pizarro

To Whom It May Concern:

This is to advise that Mrs. Rachel Pizarro is in treatment with me since June 05, 2007 because of Anxiety and depression.

Mrs. Pizarro is receiving medication to stabilize her mood. She tends to become very anxious and depressed particularly when exposed to anxiety-laden situations. She experiences nightmares and tremors particularly after exposure to one individual who comes to her area of work after they had a traumatic experience in the past.

Consequently, on behalf of Mrs. Pizarro's mental health, I am requesting that this individual not go to Mrs. Pizarro's work area.

Thank you for your attention and intervention to this very urgent request.

Ghislaine Fougy, M.D.

MCHL-PAD-MR                                    August 24, 2007

Memorandum for EEO:  (Disability Program)

RE:  Request for Medical Disability

To Whom It May Concern:

This is an official request for consideration, and assistance for being released from my
duties as a Federal Employee due to my incapacity to perform my job both physically, as
well as emotionally.  Although I have done everything in my power not to come to this
circumstance, my physical and emotional health has taken its toll. The pain from my
illness (Fibromyalgia), has become excruciating to the point it has developed into a task
just to get out of bed.  In addition, I have recently been diagnosed with scoliosis, tears on
both of my shoulder's tendons, bulging on my cervical disks, cysts on both of my ovaries,
and because of the recent events at work, my depression has been exacerbated to the
point that I have a recurring nightmare of Mr. James coming after me to kill me, and just
the mere sight of SFC O'Neal brings on anxiety that is intolerable. These nightmares are
so overwhelming, it causes me to shake like a leaf, and foremost it causes me to vomit
which very often prevents me from coming in to work. I had hoped, and dreamed I
would retire from the Federal Government, but these circumstances and experiences have
proven debilitating, and crippling not only to my physical health, but to my mental and
emotional health as well.  All of these claims can be substantiated by my doctors as well
as my supervisor.  Thanks!


Sincerely,

Mrs. Rachel Pizarro-Oquendo

Cc:  Ms. Linda Rucker, Supervisor



U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
800 N CAPITOL ST NW RM 800
WASHINGTON DC 20211    Phone # (202) 565-9770

May 1, 2000

File Number:    250549958
Date of Injury:  10/15/1996
Employee:    Linda Rucker

Linda Rucker
Po Box 292
Washington Grove, MD 20880

Dear Ms. Rucker:

This is to notify you that your occupational disease claim has been accepted for the condition(s) of:: depression (309.0) and adjustment disorder (309.28)

The FECA provides for payment of appropriate medical expenses related to your occupational disease following proper submission of charges to this office. Bills should reflect the above ICD-9 code(s) to avoid delay or rejection of payment.

Lost time from work may be claimed by filing Form CA-7. After the CA-7, later periods of disability may be claimed by filing Forms CA-8. Any claim for lost wages must be submitted through your employing agency. They will complete the pay rate information and prepare a day-by-day absence analysis showing your pay status during the period(s) claimed.

Please note that if you file a claim for lost wages, you must provide medical evidence to support disabilty for all dates in question.

TO EMPLOYER: IF A CA-7 IS FILED CLAIMING COMPENSATION FOR WAGE LOSS, PLEASE ATTACH A COPY OF THE POSITION DESCRIPTION (INCLUDING PHYSICAL REQUIREMENTS) FOR THE JOB HELD BY THE EMPLOYEE WHEN DISABILITY BEGAN.

If you have any questions regarding your claim you may contact me at the above address.

Sincerely,

Kim Olson
Claims Examiner

Enclosure:  "Guide for Claimants" containing useful information

DEPARTMENT OF THE ARMY
WALTER REED ARMY MEDICAL CNTR
CIVILIAN PERSONNEL OFFICE
ATTN HSHL CP
WASHINGTON, DC 20307

File Number: 252021874

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMPENSATION PROGRAMS
PO BOX 8300
LONDON KY 40742-8300
Phone: (202) 693-0045

February 11, 2003

Date of Injury: 5/2/02
Employee:

LINDA RUCKER
PO BOX 292
WASHINGTON GROVE, MD 20880

Dear Sir/Madam:

This is to notify you that your claim has been accepted for:**3090     Brief depressive reaction;
30928   Adjustment reaction / mixed emotional features**

If your injury results in lost time from work, you may claim disability compensation using Form
CA-7.  Please refer to the attachment entitled "Now That Your Claim Has Been Accepted."

If you have not been released to full duty, have your treating physician provide a medical report
that includes appropriate work restrictions and a statement as to when you will be released back
to full duty without restrictions.

**Take this letter to your physician and/or medical provider for their review and proof of
coverage.**

**TO EMPLOYER: IF A FORM CA-7 CLAIMING COMPENSATION FOR WAGE LOSS IS
FILED, YOU ARE REMINDED THAT 20 C.F.R. 10.111(c) REQUIRES SUBMISSION OF
FORM CA-7 WITHIN 5 WORKING DAYS.  PLEASE ALSO SEND A COPY OF THE
POSITION DESCRIPTION (INCLUDING PHYSICAL REQUIREMENTS) FOR THE JOB HELD
BY THE EMPLOYEE ON THE DATE OF INJURY.**

If you have any questions regarding your claim you may contact the Office at the above
address. Automated information regarding medical authorizations, payments for treatment,
compensation payments, and pharmacy bills can be accessed 24 hours per day by phoning 1-
866-OWCP IVR (1-866-692-7487).

NOTE:  IT HAS BEEN RECOMMENED THAT THIS CASE BE COMBINED WITH CLAIM 25
549958.

Sincerely,

JACQLYN C MORGAN
Claims Examiner

DEPARTMENT OF THE ARMY
WALTER REED ARMY MEDICAL CNTR
CIVILIAN PERSONNEL OFFICE
ATTN HSHL CP, WDC 20307



# HOWARD
## UNIVERSITY

College of Medicine
Department of Psychiatry

October 17, 2005

To Whom It May Concern:

### RE: Linda Rucker

I am a Board Certified Psychiatrist, licensed in the District of Columbia, seeing Ms.
Linda Rucker since July, 2004.

Ms. Rucker is a 54 year old African American woman living at home with her sixteen
year old daughter and boyfriend, the father of her daughter. She is a divorcee. She is
working full-time. She has suffered major depression and ultimately expressed Post
Traumatic Stress Disorder. She is currently able to get along with people, sleeping at
present with no difficulty, and her appetite is ok. She denies any low self esteem or
problems with concentration. She continues to have nightmares about her job, but they
do not affect her during the day. She occasionally has flashbacks and still is hyper-
arouseable.

She had a set-back when she missed her medication several nights, but she has since
improved.

### Impression:

Her depressive symptoms have mostly disappeared with treatment. She still has stress
related symptoms related to her job. She is able to manage them without affecting her
work. She meets criteria for major depression recurrent in remission and Post Traumatic
Stress Disorder, which is stable.

### Plan:

1. Continued group therapy 2. Seroquel 300mg 3. QHS, Clonazepan 1mg BID 4. Lexapro
10mg BID 5. She is not disabled for work.

Sincerely,

William B. Lawson, M.D., Ph.D.
Professor and Chairman



2041 Georgia Avenue, NW
Washington, DC 20060

Telephone 202 865 6611
Facsimile 202 865 6112

Oct 19 05 09:24a

WILLIAM B. LAWSON, M.D., PH.D., DFAPA
DEPARTMENT OF PSYCHIATRY
HOWARD UNIVERSITY HOSPITAL
2041 GEORGIA AVENUE NORTH WEST
WASHINGTON, DC 20060
(202) 865-6611
DEA # BL 6137916
LIC. # MD32707

NAME _____
ADDRESS _____
DATE _____
AGE _____

(IS ILLEGAL IF NOT EMPTY BLUE BACKGROUND)

℞

To ensure brand name dispensing, prescriber must write 'Brand Necessary' on the prescription.

Refill _____ times

(Signature)

6HPS0215188





12  December 2007

SUMMARY OF THE FACTS BY EXHIBITS

DOCUMENTATION PRESENTED TO WALTER REED'S EEO OFFICE

BY THE GROUP

NOVEMBER 2006 – 30 NOVEMBER 2007

08  0032

**FILED**

JAN - 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Summary

December 2006

Today Ms. Rucker was called into O'Neal's office when she came out she was crying. She came up to me saying that O'Neal said that her and I better watch our backs because she was going to be watching us. I was so upset that I went upstairs to set up an appointment to speak with the Col in charge of PAD. When Dean saw that I was crying he told MSgt Smith to talk to me, s he called me in his office. I told him that I was tired of being harassed by O'Neal & what she had told Rucker. No matter what I told him he just kept putting the blame on Ms Rucker & continued to ask me what I wanted done to her. I told him I didn't want anything done to her because I didn't see her as being the cause of the problem. In fact I believe she is being harassed also for helping me file the complaint against Mr. James. I left his office & had to take leave to go home because I was so upset. I don't know who else I can go to because it seems like nobody wants to help me.

*Ana R. Alago-Toro*
Ana R. Alago-Toro

December 20, 2006

Memorandum for Records,

In our around the second week of December Ms. Jackson, and I asked Ms. Rucker if we could put up our Christmas tree, and decorations, and she said yes, that was fine. I had bought this tree years prior, and every season we would put it up, and decorated all of our section without any problem. Although SFC O'Neal was not present at the time we started to put the tree up this day, a few minutes after her coming in the office she called Ms. Rucker in her office, and instructed her to tell us we had only 20 more minutes to finished with the decoration. I felt SFC O'Neal was angry at the fact we had not consulted with her to put up the decorations, and in my opinion she acted as if she was upset she was not in charge, and the order or idea hadn't come from her. I say this because sometime in October or November we (Inpatient Records staff) were having a meeting with SFC O'Neal to inform her of our intentions, and desire to take SPC Sook to Red Lobster for her farewell party. She adamantly informed us that it was too much trouble to take her out to Red Lobster because of time issues and some other reasons which didn't make sense to us, because they had taken other soldiers out for lunch, and it had never become an issue. She made it a point that Sook was her soldier, and that she would take care of her going away gathering. We ended up having to take annual leave to celebrate Sook's going away party in the manner she deserved. Also at this meeting she was very clear on making sure that we understood she was in charge. She went as far as to indicate the fact that she and Ms. Jackson had had some issues before when they worked together in some other Medical Facility. Ms. Jackson asked why she was bringing this up now, and what it had to do with what we were talking about. She answered by telling Ms. Jackson, "Oh! I'm sure you've already told every one". I personally found this behavior not only unprofessional, but it also demonstrated the kind of person she is, and how far she'll go to retaliate against any one she has problems with. I feel SFC O'Neal abuses her authority. I also feel that the fact I am friends with Ms. Jackson makes her want to show me she is the boss. We had a meeting over this issue, and hopefully this won't happen again.

Rachel Pizarro-Oquendo

March 2007

Toward the end of March O'Neal approached me at my desk which is in the front office accusing me of purposely filling my timesheets wrong. I explained to her several times That I had worked from 0700 to 1100, which is four hours, I put on my time sheet leave from 1200 to 1600, which is also four hours & that accounts for an eight hour work day. So I would leave at 1100 for my lunch. She told me that I was filling out my timesheets wrong & that it was considered cheating the government. I didn't appreciate her discussing this in front of my co-workers. Later that day Mrs. Rucker approached me & said that O'Neal needed to speak to me about my time sheets again. I explained it to her again & she just argued saying that by regulations I couldn't do that. I asked to see the regulation that stated this & it was never provided to me. She also made me change several leave slips from the past making me account for an extra hour. I never got this time back or got paid for it. She also added that for future leave we could take our lunch but we had to remain in the building. I asked our time keeper the secretary Mrs. Joan about this when she returned from sick leave & was told that I had been doing it correctly the entire time. I'm tired of constantly being singled out & harassed about everything that I do. Ever since the complaint was filed against Mr. James this is exactly how I'm being treated.

*Ana R Alago-toro*
Ana R. Alago-toro

April 9, 2007

For my records:

I was out sick on March 30th 2007. I called in to speak to Ms. Rucker and to let her know I wouldn't be in that morning because I was in too much pain from having moved some boxes at work a couple of days before, and that all the lifting and moving had triggered a flare-up of my fibromialgya. She wasn't in the office, so I left a message. Then I called back later to see if I could speak to her in person. At that time one of my co-workers answered the phone and explained to me that Ms. Rucker wasn't in the office at that moment, but that she and SFC O'Neal had been discussing my absence and leave slip in front of everyone in a loud and unprofessional manner. Apparently there was some confusion as to the amount of time I had taken and the way my leave slip had been filled out. I, in turn, called the office of SFC O'Neal to speak to her, I explained to her that the day before I had left at 1:30 pm, and that Ms. Rucker had asked me for a leave slip, but because I hadn't taken my lunch due to no one else being in the office at the time I had planned to leave, I had already worked thru lunch completing my 8 hours and there was no need for a leave slip. I told her the only time I owed a leave slip for was for the actual Friday which I was calling for. She asked me if I had any issues for any other days and I stated no, I did not. She seemed fine with my explanation and went on to tell me she would inform Ms. Rucker right away that I called for my absence. I told her that'd be great since I didn't want Ms. Rucker to feel as if I was going above her. I wasn't feeling quite well on Monday, so I called in sick once again. When I came in on Tuesday I received a copy of my time sheet from Mrs. Joan, advising me to go see EEO or someone in the Union, since according to SFC O'Neal, I am to include my lunch hour in my amount of time for leave. I spoke to Ms. Rucker about it that morning since SFC O'Neal wasn't going to be in that week. I asked her how I was supposed to fill in my leave slip and account for my time. I explained to her, if I had work for 4 hours or whatever the amount was, I was only to be charged for the time remaining which will add to my 8 hours. Ms. Rucker understood my explanation and stated that SFC O'Neal had been harassing her about my leave slip and was very loud and unprofessional about it. I told Ms. Rucker, I didn't understand SFC O'Neal's interest in my time sheet to begin with, since she isn't my immediate supervisor. Secondly, she acted as if there were no issues when I spoke to her telephonically on 3/30/2007. I spoke to MSG Smith about the fact that I didn't appreciate the unprofessional manner SFC O'Neal demonstrated for my absence. He assured me he would speak to SFC O'Neal once she came back. Once again, this behavior by SFC O'Neal demonstrates to me the on going persecution, prejudice, and retaliating vendetta she has against me.

Sincerely,

Rachel Pizarro-Oquendo

May 7, 2007

This morning soon after Ms. Rucker came in to the office she called Rachel in to speak with her. When Rachel was done she came to me saying that Dean McKenzie had gone to Ms Rucker the day before saying that I had left without asking anyone. Ms. Rucker later called me into her office & told me about the accusations Dean had made concerning my hours, saying that I was coming & going as I pleased creating my own hours. I have never come in at 0530; my hours are 0630-1530. I'm also not the only one with these hours, Mr. Oates has them to. I told Ms Rucker to ask him what time I come in & leave everyday in case she had any questions. I don't understand how Dean can comment on something he knows nothing about. He doesn't work in our section & I know he isn't here at 0630 in the morning to see what time I get in'let alone 0530. I was also told that I had taken leave without asking last Friday. Ms Rucker came in late that day & O'Neal was not in her office so I asked Mrs. Joan who do I give my leave slip to & she said I could give it to her since Ms. Rucker & O'Neal weren't in. I was later written up for this & my LES showed this time as AWOL. I don't understand why everybody is constantly watching everything I do & on top of that just flat out lying about what I'm doing. I have received a job rating of excellent & this is how I'm always getting treated.

Ana R. Alago-Toro

Monday May 7, 2007

Memorandum for my records:

This morning around 7:30 a.m. I was called in the office by Ms. Rucker. She started by telling me, that "somebody" from upstairs had come to her on Friday, and had spoken to her ("with her best interest in mind"), and stated I was taking lunch twice. She said I needed to make sure that when I go to the Gym I do so on my lunch hour. I responded by insisting that I do so already. I demanded she told me who the person was. She said the person had come to her confidentially. I told her I feel I'm being singled out, and she went on to explain that the person had not only complained about me, that he had also mentioned Ana's leaving early, and putting in for leave without it being approved. These false "allegations" are taking a toll on me not only physically, but emotionally as well. I feel I'm being harassed, persecuted, and singled out by the "person" telling on me especially because this person doesn't work in our area and has no idea of what arrangements I've made with my supervisor. I went and spoke to Mrs. Sherman because I was too upset, and explained to her how I work so hard, and try to help Ms. Rucker with everything she needs of me. Ms. Rucker, has witnessed, and demonstrated appreciation for my dedication and loyalty in the past. Although she didn't mention any names, I understood this person is Dean McKenzie, whom really has no reason, or business in questioning my whereabouts or personal issues. (Ms. Rucker finally admitted to the "person" being Mr. McKenzie). Had Mr. McKenzie been doing his job, he would have made sure or researched the reasons as to why I wasn't awarded any monetary rewards like Mr. Oates and Ms. Jackson when our names were submitted by Ms. Rucker; in recognition for our partaking in the Records Retirement Project. I had come to both Mr. McKenzie and SFC O'Neal sometime in October of last year, inquiring about the fact that although I entered over 90% of the total amount of records, **I was not awarded anything**. This constitutes discrimination on the basis of race, since I was the only non-African American who didn't receive a reward from the names submitted. Yet, they are so willing and interested in my whereabouts, as well as other issues that should only be handled between my supervisor and me. These actions on their part constitute harassment, persecution, discrimination, and retaliation against me. Furthermore, not only do I feel these actions are based on race, but also for partaking in Mr. James sexual harassment claim. I am getting not only physically, but emotionally sick as well, to the point I find myself having to leave work after each, and every one of these episodes. It's become so bad that I'm literally ill to the point I can't get out of bed, and every time I think of coming to work, I break out in sweat, and become nervous, and anxious. SFC O'Neal is aware of my health conditions, so I feel she has discriminated against me on the basis of disability as well. I told Mrs. Sherman that I felt so sick and upset that I would go home if I had my car. Mrs. Sherman encouraged me to under mind the incident, to relax, and to go back to my work station. I will be filling an EEO complaint for discrimination on the entire basis mentioned above.

Rachel Pizarro-Oquendo

Memorandum for Records

May 25, 2007

On Wednesday the 23 of May I took my lunch @ 13:45 because that was the time Mr. Oates, Ms. Pratt, and Ana came back from their lunch. Mr. Luthers had gone to lunch @ 1300, so definitely there was no one else to stay behind to attend to the office had we left for lunch at our scheduled time. (Ira and I are scheduled to take lunch together). Ms. Rucker was aware of our leaving- the- office- time, and asked me if I was going to eat to what I responded, no! We're going to the gym. She replied "that's were I should have gone too". We invited her to come with us, and we left. When I came back at around 3:00pm. I was received by Ana who told me to go see Ms. Rucker because SFC O'Neal was questioning her about my whereabouts, and making loud comments about how I should or shouldn't go to lunch at the time I did. I went to see Ms. Rucker, and she told me SFC O'Neal had come to her again, and was questioning her about my lunch time. She told me how SFC O'Neal had addressed her in a loud manner making everyone else (even people outside our department) aware of her inquiries. I became very upset and frustrated because I feel as though SFC O'Neal is persecuting, harassing, retaliating, and has a personal vendetta against me for partaking in Mr. James sexual harassment case. I feel this way because while everyone else was on lunch she never came by to see who was where. The outpatient department doesn't have any NCOIC in charge at this moment, and she has not demonstrated any concerns about their whereabouts. I feel that ever since SFC O'Neal learned that I was involved in the sexual harassment claim against Mr. James she's tried to retaliate against me some how, and any way she can. For example, although she had Okayed my working for comp-time a week earlier, the week we made the sexual harassment claim against Mr. James she informed Ms. Rucker I was not to work any more comp-time. (My co-workers can attest to this). She also came to Ms. Rucker and told her that "someone" had come to her and claimed that Ms. Rucker had **"given" me time off without charging me for it**. These allegations are **not** true, and I resent the fact that she would take "someone else's" word over the facts. I feel SFC O'Neal has demonstrated discrimination on the basis of race, and disability as well as retaliation. I went to see Mrs. Sherman because I was too upset, and felt so sick over the whole situation. Mrs. Sherman asked me if I would like to transfer from this office to somewhere else, to what I responded, yes, but I felt as I was being ran out of the office, and I shouldn't have to feel that way in my place of work. Again, I feel SFC O'Neal has not only created a hostile work environment, but more importantly, she is discriminating, retaliating, and harassing me. She has exacerbated my health condition to the point I find myself having to go home after these incidents, or getting too anxious at home when thinking of coming to work. I will seek redress through the EEO complaint office.

Rachel Pizarro-Oquendo

June 4, 2007

Memorandum for Records

On Friday June 1st I took some time to go to building ll to obtain proper documentation for my vehicle, and to go to the EEO office to obtain information on how to go about a class action complain against SFC O'Neal for harassment, persecution, retaliation, and abusing her authority towards me and some other co-workers. For that second reason Ana accompany me. When I came back, as I was walking in the office, Kenisha (a co-worker/friend) asked me where I had been because she had been looking for me. Jokingly (as my friend) I asked her "why you want to know? Are you keeping track of me?) At the same time SFC O'Neal was passing by, and heard my answer, and said to me. She's not, but I am. To what I responded. Why? Why are you keeping track of me? You're not my Supervisor. To what she responded (In a very loud and nasty manner as she always does), I am your Supervisor because your immediate Supervisor is not here today. I asked her why she was persecuting me. I told her the outpatient department was unsupervised, and she had no problem with them, or for that matter with any one else. She kept going back, and forward with me as to showing off her authority. She then started talking to one of her soldiers, and when she finished she walked away. I observed her when she saw Mrs. Sherman (who was standing by Mrs. Gordon's station) and started to tell her something about the incident, and Mrs. Sherman asked her to go in her office. After she came out of the office, she indicated in a very loud manner, and waving a paper (as to call attention, and making a point that she is in deed in charge) she screamed "Any one leaving early needs to come to me so that I can sign your leave slip". I went into Mrs. Sherman's office and told her what had just happened, and I told her I wanted nothing to do with SFC O'neal. Mrs. Sherman told me, that's not what she had told her, and went on to ask me if I wanted to transfer to another place. I told her, yes! I would like to be transferred, but I don't want to feel as if I'm being run out of the office. I told her I had made an EEO complain against her, and that it wasn't right or fair her behavior towards me. That I hadn't given her any reason for her to disrespect me, and that I was going to make sure someone else knows about her unprofessional behavior, abuse of authority, retaliation, and prejudice against me. I will let Mrs. Brown, and Mrs. Gonzalez @ the EEO office know about this incident.

Rachel Pizarro Oquendo

**Rucker, Linda R Ms WRAMC-Wash DC**

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Thursday, June 07, 2007 8:54 AM |
| **To:** | Davis-O'Neal Tania P SFC WRAMC-Wash DC |
| **Cc:** | Sherman, Julie U Ms WRAMC-Wash DC |
| **Subject:** | FW: ARRIVAL (UNCLASSIFIED) |
| **Signed By:** | linda.rucker@us.army.mil |

Classification:  UNCLASSIFIED
Caveats: NONE

 SFC. Davis is this for entrapment because the employee may be here at 5:30
and not get settled in till 5:48. Once again
I am not trying to give any one any time. I think Mrs. Sherman need to get
involved in this.
Thanks

-----Original Message-----
From: Pizarro-Oquendo, Rachel Ms WRAMC-Wash-DC
Sent: Thursday, June 07, 2007 5:48 AM
To: Rucker, Linda R Ms WRAMC-Wash DC
Subject: ARRIVAL (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE


Good morning Ms. Rucker,

Just my usual note to inform you of my arrival @ 5:30 a.m.  Thanks!

Sincerely,

Mrs. Rachel
Classification:  UNCLASSIFIED
Caveats: NONE

Classification:  UNCLASSIFIED
Caveats: NONE

MCHL-PAD-MR                                        7 June 2007

Memorandum For:  Walter Reed's EEO Office

SUBJECT:  Continued Retaliation, For Participating In A Sexual Harassment Case
Abuse Of Authority, Undermining The Supervisor With False Information & Creating A
Hostile Work Environment.

1.  I received a phone call from SFC Davis reminding me to forward Mrs. Rachel's
    time of arrival to her.  When I pulled up the e-mail message I noted Mrs. Rachel
    note stated 5:30 and the computer time was 5:48 am.  I replied on the message
    asking SFC if this was entrapment because the employee may be here and not get
    settled in and log on until 5:48 , I also stated once again I am not trying to give
    any one any time.  I further said Mrs. Sherman (Chief of MRAD) needed to get
    involved.

2.  A few minutes later SFC Davis came over to my office and said this is not about
    entrapment, I did not know what her intentions were.  She then called in the
    employee in and stared a conversation about an agreement we had about for
    her to work that schedule she has to sign in and cc her on the e-mail.  I replied to
    SFC Davis saying the employee was doing this out of a courtesy to me.  At that
    point Mrs. Rachel asked why was she being singled out, we were in my office at
    the time and the door was closed.  Mrs. Rachel also made a comment that two out
    patient records employees was coming in unsupervised.  At that point tempers
    began to explode between SFC Davis & Mrs. Rachel.  At some point SFC Davis
    opened the office door and called out for two outpatient record employees, asked
    them about their time and informed them of what Mrs. Rachel's comment that
    was made in the privacy of my office.  Of course the employees appeared to be
    angry.

3.  The tempers still continued to flow even though I was asking for them to lower
    their voices.  I was actually surprised at SFC Davis behavior as an NCOIC for
    MRAD.  The employee managed to get out even though SFC Davis was blocking
    the door way and went to Mrs. Sherman's office.  I went over to be with the
    employee since I was her immediate supervisor.  The argument continued and
    spilled out in outer office from Mrs. Sherman's office.  The employee was trying
    to walk away.  And Mrs. Sherman had to hold SFC Davis back from coming
    behind her at this point the whole section is aware of the disturbance.

4.  SFC Davis would then report to the police force that Mrs. Rachel made a threat
    and she was feared for her life when in fact she was provoking and intimidating
    employee and threatening her with her actions the entire time.  We then filled out
    reports until about 12pm.

EEO COMPLAINT CONT'

5.  When I was returned back to the section Mrs. Sherman was spraying something from a clear bottle in the air in Inpatient records one other employee was present, Whatever it was she sprayed I walked right into I don't know what I was inhaling. I do know it effected my sinus for a couple of days and I was sneezing. When we seen what she was doing she said " I AM GOING TO DRAG THE DEVIL OUT OF HERE" exactly what were Mrs. Sherman's intentions was this comment directed at the three of us who made the EEO complaint.

6.  I my self has felt very depressed since this disturbance , I feel the incident on this past Thursday 7 June 2007 went way over the line effecting office morale, the mission and creating a hostile work environment. There is still a fall out behind the disruption I have a number of employees calling in sick.

LINDA RUCKER
Supervisor,
Clinical Records Management

CF: LTC Taylor-Whitehead

(corrected copy)

June 8, 2007

Yesterday morning I was asked by Ms. Rucker to re-send her the arrival e-mail I sent her every morning once I get here. Later on, I was called in Ms. Rucker's office by SFC O'Neal. She started talking to me as if we have been talking already, by stating "Yeah, you know that you had agreed to send an e-mail every morning when you get here", and I replied,"No". My sending an e-mail was never an agreement. It had been a voluntary action on my part. A courtesy I extended to Ms. Rucker in case there was any question about my arriving time. (That was what I had stated in the meeting we had about SFC O'Neal's, and Mrs. Sherman's inquiring about my being here @ 5:30 a.m.) SFC O'Neal insisted that I had agreed to this, and both, Ms. Rucker, and I explained to her once again it hadn't been an agreement. She then said, I had to do it because there was no supervisor in at the time I came in. I told her, if that was the case, Outpatient Record's personnel didn't have any supervisor, and that Mrs. Jackson was here @ 6:00 a.m. She said that Mrs. Jackson wasn't getting paid for being here at that time. I told her, that even when they opened their doors @ 7:00 a. m. there was no supervisor on the floor. SFC O'Neal then reached for the door while I was standing in front of it, pushing me out of the way to get to it, and pulling on the door forcing me to move with her pulling the door open. I asked "what you are doing? Look how you're acting, you didn't even say excuse me". I pointed this out to Ms. Rucker, but Ms. Rucker looked too shocked, and fearful, and didn't react. SFC O'Neal proceeded to call on Mrs. Jackson (who was working on the front desk attending customers), and on Mr. Lewis in a very loud, and urgent manner. They both came at once, and while standing at the door SFC O'Neal stated to them, (calling on everyone's attention, as to show off her authority) this employee, (referring to me), has a problem with the time you get here. I asked Mrs. Jackson was she, or was she not here @ 6:00 a.m. to what she responded she was, but she wasn't getting paid for it. I then explained to her that really our conversation had nothing to do with them, and that personally I had nothing against either one of them. SFC O'Neal then addressed me still in a very aggressive manner, and told me, why are you backing down now? Why don't you tell them what you were saying to their faces? Implying I had been falsely accusing them of something. As to stir up animosity between the outpatient section, and me. I could not believe her unprofessional actions. She put on a spectacle, and her body language was such, as if she was ready to attack me. I kept pointing out her aggressiveness to Ms. Rucker, and all Ms. Rucker could do was to ask her to calm down. I told them I couldn't continue taking her challenging me, and I walked away into Mrs. Sherman's office. I was so upset, and in so much disbelief of SFC O'Neal's behavior, I told Mrs. Sherman, Mrs. Sherman, you need to take care of that woman. To what Mrs. Sherman replied, "first of all, you just don't walk in to my office without asking me if you can come in, and secondly, you don't tell me what I need to do. (By this time I was too nervous and upset to remember any details of such nature). I asked her the "way" she requested me to do it, and I did so. While I was explaining to her what had just transpired, SFC O'Neal walked in the office, and started talking over me, and denying what I was saying to Mrs. Sherman in the same unprofessional, belligerent, and aggressive manner in which she had addressed me before. Mrs. Sherman just stated that what we had to do was to write down a statement of what had occurred, which I felt was

a very inappropriate way of handling the situation, since SFC O'Neal's attitude, as I stated before, was very aggressive. Since I realized that SFC O'Neal's belligerent behavior wasn't stopping regardless of Mrs. Sherman's presence, I told her she was unprofessional, and foremost, ghetto, to what she responded so was I. She kept coming behind me as I was walking out of the office, and I told her, I wished we were on the street. (Meaning I would have forgotten my professionalism, and act on her provoking me to physically fight her). Again, walking behind me, she said, let's go to the street then, as a matter of fact, we're here now forget about the street. Once again, I called her ghetto, and walked out of the office. Ms. Rucker and my co-workers encouraged me to leave the office because she was provoking me, which I did. Ms. Rucker said Mrs. Sherman had to hold SFC O'Neal by her waist while telling her not to stoop down to my level, as she was still trying to come after me. I personally didn't see this. But it was funny to me, since after my being outside for a while crying of anger, I finally came inside the building, and went to the Directorates office to see if I could see Col. Taylor-Whitehead. I spoke to Mr. McKenzie, and he scheduled an appointment for me. I asked if I could speak with MSG Smith, so Mr. McKenzie brought him to the office, and I was able to speak to him. I explained to him what had just transpired, and he couldn't understand why I had to report to SFC O'Neal, if I had Ms. Rucker as my immediate supervisor. I told him that was exactly what I couldn't understand. I tried to explain to him how everything had gotten started, and I was expressing to him how I felt harassed by SFC O'Neal, and felt she was retaliating against me. I said, I really didn't know why she was after me the way she was. I said, I don't know if it is because my relationship with Ms. Jackson, and the issue they had while in South Carolina, to what he replied, you think she's going to have any issues with you over Ms. Jackson? I answered. I don't know. I can't think of what I've done to her to harass me in the faction she had. I said the only other thing I could think of was my involvement in Mr. James' sexual harassment claim which leads to his dismissal. I told him, if it was because of that, I couldn't understand it, because to my understanding there was not only "zero tolerance" for sexual harassment, but mostly the fact that she was a woman as me, would make me think she'd be more sympathetic. After all, she didn't work with Mr. James (in my opinion) long enough to have such great knowledge and appreciation of his character. After my leaving from this last office, as me and my co-worker were waiting for the elevator, I saw O'Neal coming down the hallway with a Security person. When she was in front of me, she told the officer, "That is her", her answered who, and she told him, "the employee I told you about". I had no idea what she was talking about, and came down to my office. While here at my office, I was approached by an investigator who asked me if there was some place we could talk. We went into Ms. Rucker's office, and he asked if I knew why he was here. I told him to tell you the truth I don't. He told me O'Neal had accused me of threatening her. I was in aw, since if someone should have accused any one of anything would have been me, when she touched me while going over me to open the door, and pulling me with door and all without excusing herself. The investigator looked at me, and told me, "you know what?, I believe you". I feel SFC O'Neal has demonstrated in more than one way her lack of professionalism, the length she would go to abuse her authority, and the harassment, and retaliating ways, which in my opinion, make her unworthy, incapable of not only being in charge, but foremost wearing a soldier's uniform. I will take this matter further.

Rachel Pizarro-Oquendo

June 5, 2007

Memorandum for Records

This morning while going over some personal issues with Ms. Rucker, she informed me that SFC O'Neal had asked to forward her the daily e-mail I send Ms. Rucker every morning stating my arrival's time. This e-mail was a voluntary action I do on my behalf for Ms. Rucker and me in order to document (in case any body request it) my time of arrival; since I was the only one in the office at that time. (I had family related issues that required me to make changes to my schedule approved by Ms. Rucker, and Mrs. Sherman) I included this e-mail to SFC O'Neal for a while, (again voluntarily) and I recently stopped since I figured it was enough informing my immediate supervisor. SFC O'Neal's demanding to know my arrival time demonstrate once again the discrimination, harassment, reprisal and retaliation vendetta she has against me. (She is not requesting anyone else's arrival time, nor does anyone else volunteer this information in this fashion). I feel too mentally and emotionally drained to stay in the office. I will request a Workers Compensation form from Mrs. Sherman, and will leave to seek some help from a Doctor.

Rachel Pizarro-Oquendo

**Rucker, Linda R Ms WRAMC-Wash DC**

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Friday, June 15, 2007 9:45 AM |
| **To:** | Brown, Tammi M Ms WRAMC-Wash DC |
| **Subject:** | FW: Reference To Complaint Of Discrimination (UNCLASSIFIED) |
| **Signed By:** | linda.rucker@us.army.mil |

```
Classification:  UNCLASSIFIED
Caveats: NONE


-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Friday, June 15, 2007 9:37 AM
To: Brown, Tammi M Ms WRAMC-Wash DC
Subject: Reference To Complaint Of Discrimination (UNCLASSIFIED)


    Memorandum For WRAMC EEO OFFICE                    15 June 2007


    Dear\Mrs. Brown, (Counselor EEO Office)

       I  wanted to upated you on Mrs.Rachel, Mrs. Ana and myself, we all
continue to have backlashes from the hostile environment that had been
created for months, the employees continue to have unsual absences, as for
myself I am not feeling well but considering the circumstances I have to
hold the ship together.  Even with Management continuining to turn
everything arround on me even though I am not the cause of the issue it's
very stressful.

       I keep having flashbacks form the spray that was sprayed in the
office and the comment made while spraying, I suffer from depression and
post traumatic stress disorder.  We all have different religious beliefs and
what ever was sprayed may have been a health factor.  I feel this whole
issue on Thursday 7 June was reprisal and creating a hostile work
environment including the spray that was sprayed from the bottle.



       We have gotten some legal advise and the three of us can make a
complaint as a group, we all know this is about the sexual harassment
complaint we participated in.  We will have our consultation on next week
and then we will contact you.


LINDA RUCKER
Supervisor,
Clinical Records Management


Classification:  UNCLASSIFIED
Caveats: NONE
```

1

MCHL-PAD-MR                          17 July 2007

MEMORANDUM FOR:  WRAMC EEO OFFICE

SUBJECT:  Continued Reprisal, Intimidation, Creating A Hostile Work Environment
Deformation Of Character

    This morning SFC Arrindale was asking questions about the retirement I filled her in
to the best of my knowledge.  She then went to Mrs. Sherman (Chief of MRAD) with
some questions.  SFC Arrindale asked me to come over to Mrs. Sherman's office.  Mrs
Sherman called me a "LIAR" in the presence of SFC Arrindale and she continued to say
it she must have called me liar about seven or eight times.  My response was Mrs.
Sherman I would not tell an untruth like that and but she refused to listen. I had
mentioned Col. Amaker's name to her as being the Director of the Record Retirement
section at PASBA.  I have two e-mail's with Col. Amaker's name and Mrs. Julie
Sherman's name.  I was still called a liar multiple times.

    Mrs. Sherman's  actions toward me is in retaliation for the religious complaint we
made against her for spraying the section, whatever was sprayed I walked right in too and
inhaled it in my body I was sick on the stomach for three days.  To called a subordinate a
liar in such a hostile demeanor is inappropriate for the Chief of MRAD. I consider this
action to  be deformation of character and defaming my twenty year federal career.

LINDA RUCKER
Supervisor,
Clinical Records Management

**Rucker, Linda R Ms WRAMC-Wash DC**

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Monday, April 16, 2007 9:37 AM |
| **To:** | Blagg, Chuck Mr PASBA-FSHTX |
| **Cc:** | Amaker, Christopher F LTC PASBA-FSHTX; Miller, John M MAJ PASBA-FSHTX; Foley, Teresa M Ms OTSG; Davis-O'Neal Tania P SFC WRAMC-Wash DC; Sherman, Julie U Ms WRAMC-Wash DC |
| **Subject:** | RE: MRRT (UNCLASSIFIED) |
| **Signed By:** | linda.rucker@us.army.mil |


Classification:  UNCLASSIFIED
Caveats: NONE

Thanks Mr. Blagg, In response to your -e-mail, we have decided to no longer
divide the sections, since the method for shipping is 45 boxes per skid we
are creating sections of forty five. We have one section # 3 from the old
indexes we created giving us problems because the indexes were entered at
the warehouse and we was not connected to the land.  Therfore I had index
MRR003700000000in200607070853 scanned and sent the index to PASBA.DATA  and a
copy to your regular e-mail hoping for support.  We have also sent several
other indexes from our desk tops over the past two weeks of which I have have
inquired about with no response. The old index file number listed above I
explained to you that the records that were lined through were records not
in the box or duplications, I also informed you the entire index had been
matched with each box.  If there are records missing or duplications NPRC
automtically delete these records from the registry.  Walter Reed  has a
number of old records to retire and we are on a timeline we need your
support.  We are currently down even though we had the program Mr Milton
Bell sent to us a week ago installed by an IT Specialist.  The program is an
excellent idea to
retire the old records but the program is not user friendly, and yes we are
tabbing through all the fields when entering the information.

I will be contacting the IT specialist so we may contact you to trouble
shoot this problem. What happens is when you enter the information it
rearranges the data in each box.

Worse comes to worse I don't see why we can't scan the files we do have
ready and send them through an AKO account to PASBA.DATA. Why  can't this be
a variable solution.

Thanks


LINDA RUCKER
Supervisor,
Clinical Records Management
(202) 782-1377

-----Original Message-----
From: Blagg, Chuck Mr PASBA-FSHTX
Sent: Friday, April 13, 2007 12:50 PM
To: Rucker, Linda R Ms WRAMC-Wash DC
Cc: Amaker, Christopher F LTC PASBA-FSHTX; Miller, John M MAJ PASBA-FSHTX;
Foley, Teresa M Ms OTSG
Subject: MRRT

Linda:
I received your voicemail and attempted to return your call, but you were
not available.
I previously sent you a message indicating that I would not be available to
work on this issue until next week. Please give me some advance notice when
your IT specialist will be there so that I can try to match my schedule up

1

with his availability. Calling me without advance notice is a losing proposition, I am frequently on the phone for long stretches.

Also in my previous email message, I sent you a spreadsheet of names to investigate associated with PC3 data. Have you researched these names? The data correction (if necessary) and recreation of the electronic transmittal, will need to be accomplished at your site. That is why I sent you the data and application back, so that you could make whatever corrections and recreate the electronic transmittal. Sending me scanned copies of retirement inventories really does not further the cause of correcting the data.

I would like to restate my caution regarding the continued data entry of new records.
Shipments of 50 boxes of records is not recommended. When you have a small problem, it holds up a lot of records from being retired. Or if you have a procedural problem, it requires you to make a small correction to a lot of records.
The data indicated that there were some data entry procedural problems associated with some of the previous 150 boxes of records from PC1, PC2, and PC4.

I would like to get a feel for the level of effort for the remainder of this task. Please answer the following questions:
1. Besides the 50 boxes of records associated with PC3, how many more boxes of medical records do you have to retire?
2. All of these records are too old to enter into CHCS, and have never been entered into CHCS, correct?


I understand that you are trying to get these records retired, and PASBA will try to help you as time permits.

Chuck Blagg
PASBA Development, Chief
Phone: (210) 295-9108
DSN: (312) 421-9108
Fax: (210) 221-2046
E-mail: chuck.blagg@amedd.army.mil
E-mail: chuck.blagg@us.army.mil
Classification:  UNCLASSIFIED
Caveats: NONE

Rucker, Linda R Ms WRAMC-Wash DC

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Tuesday, April 24, 2007 4:23 PM |
| **To:** | Blagg, Chuck Mr PASBA-FSHTX |
| **Cc:** | Amaker, Christopher F LTC PASBA-FSHTX; Foley, Teresa M Ms OTSG; Miller, John M MAJ PASBA-FSHTX; Davis-O'Neal Tania P SFC WRAMC-Wash DC; Sherman, Julie U Ms WRAMC-Wash DC |
| **Subject:** | RE: Scanned files for retirement (UNCLASSIFIED) |
| **Signed By:** | linda.rucker@us.army.mil |

Classification:  UNCLASSIFIED
Caveats: NONE

   Mr Blagg in my response to you on last week I infomed of the files that
were done prior to Mr Bell sending us a new MRRT program,  I also told you
there must be some way to transmitt this data because when we try send it
through the program it's not being received.  I further infomed you the new
MRRT is not working, which has us at a stand still and we can not afford to
be at a stand still.  I asked for your support to get this informtion
transmitted so that we may ship.  What is the plan for the MRRT program, at
some point I am hoping we can get a hands on on this program
,timelines is the issue here.

LINDA RUCKER
(202) 782-1377

-----Original Message-----
From: Blagg, Chuck Mr PASBA-FSHTX
Sent: Tuesday, April 24, 2007 10:46 AM
To: Rucker, Linda R Ms WRAMC-Wash DC
Cc: Amaker, Christopher F LTC PASBA-FSHTX; Foley, Teresa M Ms OTSG; Miller,
John M MAJ PASBA-FSHTX
Subject: RE: Scanned files for retirement (UNCLASSIFIED)

Linda:
I have no idea why PASBA received these scanned images of retirement file
inventories.
The message below gives me no indication as to the purpose of receiving this
PHI data in a scanned form.
I have previously told you that scanned images cannot be used to
electronically retire medical records.

Why did you send this information to PASBA?

-----Original Message-----
From: Manu, Ira B Mr WRAMC-Wash DC
Sent: Tuesday, April 24, 2007 8:59 AM
To: pasba.data@us.army.mil
Cc: Blagg, Chuck Mr PASBA-FSHTX; Bell, Milton T Mr PASBA-FSHTX; Rucker,
Linda R Ms WRAMC-Wash DC; Manu, Ira B Mr WRAMC-Wash DC
Subject: Scanned files for retirement (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE

Attached are 4 files.  If there's any questions or concerns, please direct
them to Inpatient Records supervisor, Mrs. Linda Rucker @ 202.782.6158.
        Classification:  UNCLASSIFIED
Caveats: NONE

Classification:  UNCLASSIFIED
Caveats: NONE

MCHL-PAD-MR                                    17 July 2007

MEMORANDUM FOR: WRAMC EEO OFFICE

SUBJECT: Continued Reprisal, Intimidation & Creating A Hostile Work Environment

This morning SFC Arrindale was asking questions about the retirement I filled her in to the best of my knowledge. She then went to Mrs. Sherman (Chief of MRAD) with some questions. SFc Arrindale asked me to come over to Mrs. Sherman's office. Mrs Sherman called me a "LIAR" in the presence of SFC Arrindale and she continued to say it she must have called me liar about seven or eight times. My response was Mrs. Sherman I would not tell an untruth like that and but she refused to listen. I had mentioned Col. Amaker's name to her as being the Director of the Record Retirement section of PASBA

Mrs. Sherman's actions toward me is in retaliation for the religious complaint we made against her for spraying the section, whatever was sprayed I walked right in too and inhaled it in my body I was sick on the stomach for three days. To called a subordinate a liar in such a hostile demeanor is inappropriate for the Chief of MRAD. And saying the words "she is going to drag the devil out of here"

LINDA RUCKER
Supervisor,
Clinical Records Management

Memorandum for Records

May 25, 2007

On Wednesday the 23 of May I took my lunch @ 13:45 because that was the time Mr. Oates, Ms. Pratt, and Ana came back from their lunch. Mr. Luthers had gone to lunch @ 1300, so definitely there was no one else to stay behind to attend to the office had we left for lunch at our scheduled time. (Ira and I are scheduled to take lunch together). Ms. Rucker was aware of our leaving- the- office- time, and asked me if I was going to eat to what I responded, no! We're going to the gym. She replied "that's were I should have gone too". We invited her to come with us, and we left. When I came back at around 3:00pm. I was received by Ana who told me to go see Ms. Rucker because SFC O'Neal was questioning her about my whereabouts, and making loud comments about how I should or shouldn't go to lunch at the time I did. I went to see Ms. Rucker, and she told me SFC O'Neal had come to her again, and was questioning her about my lunch time. She told me how SFC O'Neal had addressed her in a loud manner making everyone else (even people outside our department) aware of her inquiries. I became very upset and frustrated because I feel as though SFC O'Neal is persecuting, harassing, retaliating, and has a personal vendetta against me for partaking in Mr. James sexual harassment case. I feel this way because while everyone else was on lunch she never came by to see who was where. The outpatient department doesn't have any NCOIC in charge at this moment, and she has not demonstrated any concerns about their whereabouts. I feel that ever since SFC O'Neal learned that I was involved in the sexual harassment claim against Mr. James she's tried to retaliate against me some how, and any way she can. For example, although she had Okayed my working for comp-time a week earlier, the week we made the sexual harassment claim against Mr. James she informed Ms. Rucker I was not to work any more comp-time. (My co-workers can attest to this). She also came to Ms. Rucker and told her that "someone" had come to her and claimed that Ms. Rucker had **"given" me time off without charging me for it**. These allegations are **not true**, and I resent the fact that she would take "someone else's" word over the facts. I feel SFC O'Neal has demonstrated discrimination on the basis of race, and disability as well as retaliation. I went to see Mrs. Sherman because I was too upset, and felt so sick over the whole situation. Mrs. Sherman asked me if I would like to transfer from this office to somewhere else, to what I responded, yes, but I felt as I was being ran out of the office, and I shouldn't have to feel that way in my place of work. Again, I feel SFC O'Neal has not only created a hostile work environment, but more importantly, she is discriminating, retaliating, and harassing me. She has exacerbated my health condition to the point I find myself having to go home after these incidents, or getting too anxious at home when thinking of coming to work. I will seek redress through the EEO complaint office.

Rachel Pizarro-Oquendo

Rucker, Linda R Ms WRAMC-Wash DC

To:
Subject:                    FW: Reference To Complaint Of Discrimination (UNCLASSIFIED)

2007 AUG -1 PN 2:50

-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Wednesday, August 01, 2007 11:22 AM
To: 'tammi.browm@na.amedd.army.mil'
Subject: Reference To Complaint Of Discrimination (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE


Memorandum For:  Walter Reed Army Medical Center EEO Office,

Mrs. Tammi Brown (EEO Counselor)


SUBJECT:  Change In Immediate Supervisor

        Within the past two years I am the only Supervisor they have
rotated through four Supervisors.  Mrs. Sherman has now assigned me to
a fifth one.  The female she just assigned me to is has a previous
relationship with Mrs. Sherman and just came on board her at WRAMC.  I am in
fear of the retaliation that will be inflicted by Mrs. Sherman through this
new supervisor since they have a previous relationship.  In all honesty I am
afraid of what may happen to me. My medical condition has been aggrivated
enough I am trying to make it to retirement in five years I will be sixty
two.

        I suffer from depression and post traumatic stress disorder,
considering the thing that have happened with the hostile reprisal, I can no
longer take this treatment.  I will be contacking FECA for a change in
assignment.  I believe the reprisal will continue just in a different way.

LINDA RUCKER
Supervisor,
Clinical Records Management
Classification:  UNCLASSIFIED
Caveats: NONE

1

Rucker, Linda R Ms WRAMC-Wash DC

**To:** -
**Subject:** FW: Reference To Complaint Of Discrimination (UNCLASSIFIED)

2007 JUL 32 PM 2: 48

Aug\

-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Wednesday, August 01, 2007 11:22 AM
To: 'tammi.browm@na.amedd.army.mil'
Subject: Reference To Complaint Of Discrimination (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE


Memorandum For:  Walter Reed Army Medical Center EEO Office,

Mrs. Tammi Brown (EEO Counselor)


SUBJECT:  Change In Immediate Supervisor

        Within the past two years I am the only Supervisor they have
rotated through four Supervisors.  Mrs. Sherman has now assigned me to
a fifth one.  The female she just assigned me to is has a previous
relationship with Mrs. Sherman and just came on board her at WRAMC.  I am in
fear of the retaliation that will be inflicted by Mrs. Sherman through this
new supervisor since they have a previous relationship. In all honesty I am
afraid of what may happen to me. My medical condition has been aggrivated
enough I am trying to make it to retirement in five years I will be sixty
two.

        I suffer from depression and post traumatic stress disorder,
considering the thing that have happened with the hostile reprisal, I can no
longer take this treatment.  I will be contacking FECA for a change in
assignment.  I believe the reprisal will continue just in a different way.

LINDA RUCKER
Supervisor,
Clinical Records Management
Classification:  UNCLASSIFIED
Caveats: NONE

## Rucker, Linda R Ms WRAMC-Wash DC

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Wednesday, August 08, 2007 11:25 AM |
| **To:** | 'tammi.browm@na.amedd.army.mil'; Taylor-Whitehead, Cheryl LTC WRAMC-Wash DC |
| **Cc:** | Alago-Toro, Ana R Ms WRAMC-Wash DC; Pizarro-Oquendo, Rachel Ms WRAMC-Wash-DC |
| **Subject:** | Reference To Complaint Of Discrimination, Continued Reprisal , Abuse Of authourity and Creating A Hostile & Stressful Environmemnt (UNCLASSIFIED) |
| **Signed By:** | linda.rucker@us.army.mil |

Classification: UNCLASSIFIED
Caveats: NONE

Memornadum For:  WRAMC EEO Office

Dear Mrs. Tammi Brown (EEO Counselor)


I think I called to you attention that Mrs. Sherman (GS-13)Chief Of MRAD)  hired an acquintance of hers to become my immediate supervisor and my concerns it's happened.  My section had a GS-6 Lead Medical Record Technician Position open.  Mrs. Sherman was the point of contact, I asked on several occasions for the package, I was going to set up interviews to keep it fair because I know other employees in the office applied as well. On 7 August 2007 I was informed a selection was made.  I was hurt, Mrs. Hinnant now my immediate supervisor infomed me that she and Mrs. Sherman (Chief of MRAD) made a selection and they can do that.  I then said there is nothing in my work history saying I could not make my selction myself since I have to work with this
person and not just that I am the one that's down in the trenches and know what has to be done to acccomplish the mission. Mrs. Sherman has not done this to any of the other Supervisors.

Mrs Sherman's constant retaliation is getting hard to bear,  I had to ask who was selected and no one infomed the Staff either.  Mrs Ana came to me this morning inquiring about the position since she has a ten point veteran's preference and felt she should have been interviewed as well Mrs. Sherman continues to retaliate and abuse her authourity and continues to create a hostile work environment.  Which effects the office morale and Staff performance.


There is just too many  incidents of illegal discrimination by Mrs. Sherman a (GS-13, Chief of MRAD) there was the incident of her spraying us with something in a clear bottle and saying the words " I'm going to drag the devil out of here", there was the incident of her calling me a LIAR in the presence of SFC Arringdale saying I never told he anything about LTC Amaker I went through my e-mails and there were two with Mrs. Sherman & LTC Amakers's name and one where I specifically wrote to her and SFC Davis stating LTC Amaker heads up that medical record retirement section at PASBA. I infomed Mrs. Sherman I would not make an untruth like that yet she continued to call me a LIAR seven or eight times.  A few weeks after this incident I was called to her office to pick up some paperwork I looked up above her office door and there where two crosses taped there.  When I seen them I felt very uncomfortable I infomed EEO of the crosses who said it was illegal that only the chaplin can have a cross up on his wall.


The stress this is causing me and the employees involved in this complaint causing health concerns I myself have a FECA claim for depression & postraumatic stress disorder and the environment being creatd by Mrs. Sherman, Mrs Rachel has since filed a FECA claim as well. I don't understand

1

. how she can head up a Division because to commit acts like this they have to be premeditaded, in other words she has to be plotting and plannning against us three employees.

Please provide us with our next step in the complaint process, we must file a formal complaint something has to be done. I will provide a hard copy to EEO as well.

LINDA RUCKER

Mrs. Ana Alago-Toro

Mrs. Rachel Pizarro-oquendo
Classification: UNCLASSIFIED
Caveats: NONE

**Rucker, Linda R Ms WRAMC-Wash DC**

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Thursday, September 06, 2007 12:16 PM |
| **To:** | 'tammi.browm@na.amedd.army.mil' |
| **Subject:** | Reference To Complaint Of Discrimination , Continue Reprisal,Job Harrassment , Hostile A Work Emvironment & Intimidation (UNCLASSIFIED) |

2007 SEP 10  AM 11: 35

Classification:   UNCLASSIFIED
Caveats: NONE
     Memorandum For EEO office WRAMC

Dear Mrs. Tammi Brown (EEO counselor)

     Tuesday Morning 4 September 2007 Mrs Hinnant , the new Supervisor I was placed under has me concerned.  She said that "she was trying to keep me from getting in trouble" and she mentioned the advance sick Leave of Mrs Rachel. She also stated the an employee can be terminated after fifteen years of service. I became concerned about the comments and immediately went to Management Employee Relations for guidance. They wanted to know how I was going to get in trouble when Mrs. Sherman (Chief of MRAD GS-13) signed off on the avanced sick leave. MER further informed me that they would investigate Mrs. Rachel's circumstances and get back with me.  However Mrs. Rachel faxed me a letter from her Psychiatrist placing her on two weeks sick leave due to her illness.

     I always follow procedure and to be threatened and intimidated because two of my employees have documented illnesses and are sick, Mrs Rachel even has spent time in the hospital and now seeing a Psychiatrist I have to wait for guidance from MER. Why is there such a concern about two people who are involved in an EEO complaint and the threatening of my job as well because of the EEO complaint we have filed. Yes the same old story just a different person creating a hostile work environment and continued retaliation & Knowling aggrivating known medical conditions of subordinate employees.

LINDA RUCKER
Superviosr,
Clinical Records Management


Classification:   UNCLASSIFIED
Caveats: NONE

1

MCHL-PAD-MR                                    10/ 22/2007

MEMORANDUM FOR:  WRAMC EEO OFFICE

SUBJECT:  Continued Reprisal , Defaming My Character, Creating A Hostile Work
Environment Undermining My Authority As The Supervisor, Discourtesy  Religious
Discrimination Against Mrs. Julie Sherman(Chief Medical Records Division)

    This afternoon I was presented another blow of unfair treatment . The Chief Of
Medical Records Mrs. Julie Sherman  received the listing for hiring a GS-5 Medical
Records Technician.  Instead Of Mrs. Sherman The GS-13 passing the listing to me she
passed it to Mrs. Hinnant GS-11.  As the first line Supervisor for a GS-5 position, why
am I treated so differently from the other Supervisors, who were given an opportunity
to set up interviews with a panel which I sat on the panel.

    This has been going on for months with Mrs. Sherman, she do things then deny
It ever happened the same way she came in to the section and sprayed something from a
clear bottle with the words she said I took it to be some kind of ritual which she has since
denied.  Further more during this same time she had two crosses with crucifix above her
office door.  She make comments to and against you to other people then she denies it
was ever said.  There was the incident that she called me a liar seven or eight times in the
presence of SFC Arrindale and denied me ever telling her anything about LTC Amaker
heading the retirement Division at PASBA.  I would later disprove that with e-mails that I
specifically notified Mrs. Sherman Of LTC Amaker's role .  I m still in disbelief that the
Chief Of Medical Record Division would use such language.

    It's a terrible feeling to be discriminated against, what Management don't understand
is how deep it really go to be treated so differently,  and how it effects your medical
conditions.  How Consistently creating a hostile and stressful environment effects not just
me but the mission and the morale of the employees as well.

    After the attached memo I was given the list, however the damage was already done.

LINDA RUCKER
CRM

MCHL-PAD-MR                                    7 November 2007

SUBJECT:  Reprisal For participating In Prior EEO Activity And Bias By A Walter Reed
EEO official Mrs. Tammi Brown (EEO Counselor)

NOV 7  PM 12: 31

Mrs. Tammi Brown's bias attitude has reached a point of Reprisal when she mentions
my prior EEO activity in writing.  I think Mrs. Brows bias and retaliatory attitude has
prevented me from getting fair treatment with my EEO process, therefore I am making a
complaint against for intentional reprisal and bias treatment because I participated in
prior activity.  Mrs Brown should have removed herself from the case rather than violate
an Employees due process.

LINDA RUCKER
CRM
(202) 782-1377

**Rucker, Linda R Ms WRAMC-Wash DC**

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Tuesday, November 06, 2007 1:51 PM |
| **To:** | Brown, Tammi M, Ms WRAMC-Wash DC |
| **Cc:** | Dickenson, Thomas F Mr WRAMC-Wash DC |
| **Subject:** | RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED) |

Classification:  UNCLASSIFIED
Caveats: NONE

----

Mrs Brown exactly, we all have the same intentions of filing our complaint as a group and I will  continue to be the spokeperson for the group.  Because you decide to dismiss a complaint means it's over, thats not the case, I see you are being real clever with your language but the group no you do not have our best interest in this matter, I do.
I have been through this process to many times with Medical Record Division and it appears this office is practicing ths same discrimination.  I would prefer no further contact with you except for the name of the Secretary of the Army and I will be filing an EEO complaint against your self this E-mail string documents your bias attitude which could mean this office is retaliating as well you had no grounds to dismiss my complaint without a formal investigation. This was not the case when I contacted this office about the sexual harrassment complaint and we three employees participated in that investigation that facts can not be changed.
   Mr, Dickerson please advise this EEO Counselor not to contact me any further, this is harassment simply because we am seeking justice for unfair personell practices, can you please assign another counselor to provide me the information we need to proceed. This back and forth has to stop.


-----Original Message-----
From: Brown, Tammi M Ms WRAMC-Wash DC
Sent: Tuesday, November 06, 2007 11:36 AM
To: Rucker, Linda R Ms WRAMC-Wash DC
Subject: RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE

Ms. Rucker

As you have participated in the EEO process several times I know you are aware of the process. IF a complaint is accepted, it will be investigated WITHIN  180 days of the complainant filing formal.  Your complainant was dismissed at the formal stage for the reason mentioned in your dismissal letter.
Our process is based on Regulations and Laws.  We adhere to the regulations outlined in MD-110 and AR -690-600 and 29 CFR 1614. If you wish to appeal your dismissal please refer to the procedure outlined in your letter.

As you do not represent an agency of a class, I cannot discuss anyone else's claim with you, nor will I accept any correspondence you submit on their behalf.


Tammi Brown
WRAMC EEO Specialist
202-782-4633
-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Tuesday, November 06, 2007 11:22 AM
To: Brown, Tammi M Ms WRAMC-Wash DC
Cc: Alago-Toro, Ana R Ms WRAMC-Wash DC; Pizarro-Oquendo, Rachel Ms WRAMC-Wash-DC

1

Subject: RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE

Mrs Brown ( EEO Counselor) WRAMC  In the formal complaint I once again mentione that the three of us wante to file as a group,  You told us during the meeting that you could combine the complaints at the formal stage which did not happen, ,nor did the agency conduct a formal investigation see "Civil Rights Act Of 1964".  The three of us will be taking our complaint to another level.  May I please have the name of the Secretary Of the Army.  I can't believe that A GS-13 Chief Of Medical Records can come in to section spray something, and say the language she used without some kind of action be taken, Which was against Mrs Rachel, Mrs. Ana and myself & also at the SFC Davis to create such a disturbace in the work place and no action be taken.  What the EEO Office fail to realize is when you are placed in a hostile and stressful environment it's not easy to shake off especially when you are suffering from depression, post traumatic stress disorder as for Mrs Rachel, Mrs. Ana and myself. In fact I have two approved workmens compensation claim that's job related and the Medical Record Division continue down the same old path with reprisal, creating a hostile work environment, defaming subordinates character, religious discrimination & which included two crosses ,with the crusifix above her door. This complaint comes down to one issue the three of us participating in a sexual harrsssment complaint in which one was the victim. I thought the EEO Office job was to protect our rights and at the time we thought we were participating in protected activity which later we found out we were not.

Thanks


-----Original Message-----
From: Brown, Tammi M Ms WRAMC-Wash DC
Sent: Monday, November 05, 2007 7:17 AM
To: Rucker, Linda R Ms WRAMC-Wash DC
Cc: Alago-Toro, Ana R Ms WRAMC-Wash DC; Pizarro-Oquendo, Rachel Ms WRAMC-Wash-DC
Subject: RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE

Classification:  UNCLASSIFIED
Caveats: NONE

Classification:  UNCLASSIFIED
Caveats: NONE

Ms. Rucker

As I have repeatedly tried to explain to you there are two types of complaints, individual and class.  A class is a group of employees, former employees or applicants who, it is alleged, have been or are being adversely affected by an agency personnel management policy or practice that discriminates against the group on the basis of their RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE OR DISABILITY (please refer to chapter 6 of AR 690-600).

While you in fact did submit a letter to this office on June 5, 2007 in regards to filing a class action, when I met with the three of you on June 13, 2007 I informed the three of you of the requirements for filing a class and a individual complaint. You cautioned the other two individuals that the three of you should consult an attorney before proceeding.

On July 19, 2007 I met with the three of you. You informed me that the three of you had consulted with an attorney who advised you that you could file as a group.  I, in turn explained thoroughly, the procedures for filing both types of complaints. The three of you each decided to pursue individual complaints. I also informed the three of you that you would each receive separate docket numbers and each of you would separately, go through the informal process.

I also advised the three of you that there was a possibility that the three complaints MAY BE consolidate at the investigative stage if they involved similar allegations or related to the same matter, every one agreed to pursue individual complaints.

All three of you individually went through the informal process and all three of you were provided a separate notice of the right to file.

On July 25, 2007 after signing your notice of right to file you stated that YOU wished to pursue the class complaint. I advised you that you cannot go back and file a class complaint on the same issue you decided to file an individual complaint on. I also read, verbatim, section 6-1 of AR 690-600 to you.

In sum, each of you CHOSE to pursue individual complaints and chose to file separate formal complaints and each case will be processed accordingly.

Tammi Brown
WRAMC EEO Specialist
202-782-4633
-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Friday, November 02, 2007 10:00 AM
To: Brown, Tammi M Ms WRAMC-Wash DC
Cc: Dickenson, Thomas F Mr WRAMC-Wash DC
Subject: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Deformation Of Character & Job Harassment (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE


Dear Mrs. Brown,( Walter Reed EEO Counselor)

Complaint Of Discrimination Against : SFC Tania Davis O'neal & Mrs Julie Sherman

    In review of the letters we received in reference to our complaint of Discrimination, As the spokes person for the group we have called attention to Walter Reed's EEO office on several occasions that we would be filing the complaint as a group. As you know we were infomed by Passman & Kaplan in a paid consultation and highly acknowleged Lawyers in Labor Discrimination advised us we could file as a group if circumstances are similar sitiuated we made contact with the WRAMC EEO Office on 5 June 2007 at that time we infomed the EEO Office that we had participated in a Sexual Harassment Complaint and that one of us was the victim.  On 7 June 2007 When SFC Davis O'neal did infact in my office go over my head and questioned the employee causing the Employee to feel SFC Davis was singleing her out and at that time a large disturbance started that spilled over in to Mrs. Sherman's office (Chief MRAD) at some point Mrs. Sherman had to pull SFC Davis o'neal back. This same day Mrs. Sherman came over to the Inpatient Record Section & and sprayed something from a clear bottle saying the words "she was going to drag the devil out of here" as if she was performing some ritual. The Inpatient Record Section was the only section sprayed.

    Further more the employees involved in the complaint as myself went to MSG Smith about SFc Davis " his response was what do you want to happen to Mrs. Rucker"  I am not the male employees who kissed the female employees feet.  How can you turn that type of complaint arround on the Supervisor, who contacted EEO for guidance.

    A hostile & stressful environment aggrivates known mental medical conditions & created new ones, it has also effects office morale and production.  We will once again present the facts and dates supporting our case of discrimination for participating in protected activity in the investigation of a sexual harassment complaint.
The above dates and times is just a few of documented information we haved invloving our complaint.

3

**Rucker, Linda R Ms WRAMC-Wash DC**

| | |
|---|---|
| **From:** | Rucker, Linda R Ms WRAMC-Wash DC |
| **Sent:** | Tuesday, November 06, 2007 1:51 PM |
| **To:** | Brown, Tammi M Ms WRAMC-Wash DC |
| **Cc:** | Dickenson, Thomas F Mr WRAMC-Wash DC |
| **Subject:** | RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED) |

Classification:   UNCLASSIFIED
Caveats: NONE

---

Mrs Brown exactly, we all have the same intentions of filing our complaint as a group and I will continue to be the spokeperson for the group. Because you decide to dismiss a complaint means it's over, thats not the case, I see you are being real clever with your language but the group no you do not have our best interest in this matter, I do. I have been through this process to many times with Medical Record Division and it appears this office is practicing this same discrimination. I would prefer no further contact with you except for the name of the Secretary of the Army and I will be filing an EEO complaint against your self this E-mail string documents your bias attitude which could mean this office is retaliating as well you had no grounds to dismiss my complaint without a formal investigation. This was not the case when I contacted this office about the sexual harrassment complaint and we three employees participated in that investigation that facts can not be changed.

Mr, Dickerson please advise this EEO Counselor not to contact me any further, this is harassment simply because we am seeking justice for unfair personell practices, can you please assign another counselor to provide me the information we need to proceed. This back and forth has to stop.

-----Original Message-----
From: Brown, Tammi M Ms WRAMC-Wash DC
Sent: Tuesday, November 06, 2007 11:36 AM
To: Rucker, Linda R Ms WRAMC-Wash DC
Subject: RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED)

Classification:   UNCLASSIFIED
Caveats: NONE

Ms. Rucker

As you have participated in the EEO process several times I know you are aware of the process. IF a complaint is accepted, it will be investigated WITHIN 180 days of the complainant filing formal.  Your complainant was dismissed at the formal stage for the reason mentioned in your dismissal letter.
Our process is based on Regulations and Laws. We adhere to the regulations outlined in MD-110 and AR -690-600 and 29 CFR 1614. If you wish to appeal your dismissal please refer to the procedure outlined in your letter.

As you do not represent an agency of a class, I cannot discuss anyone else's claim with you, nor will I accept any correspondence you submit on their behalf.


Tammi Brown
WRAMC EEO Specialist
202-782-4633
-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Tuesday, November 06, 2007 11:22 AM
To: Brown, Tammi M Ms WRAMC-Wash DC
Cc: Alago-Toro, Ana R Ms WRAMC-Wash DC; Pizarro-Oquendo, Rachel Ms WRAMC-Wash-DC

1

Subject: RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE

Mrs Brown ( EEO Counselor) WRAMC  In the formal complaint I once again mentione that the three of us wante to file as a group,  You told us during the meeting that you could combine the complaints at the formal stage which did not happen, nor did the agency conduct a formal investigation see "Civil Rights Act Of 1964".  The three of us will be taking our complaint to another level.  May I please have the name of the Secretary Of the Army.  I can't believe that A GS-13 Chief Of Medical Records can come in to section spray something, and say the language she used without some kind of action be taken, Which was against Mrs Rachel, Mrs. Ana and myself & also at the SFC Davis to create such a disturbace in the work place and no action be taken.  What the EEO Office fail to realize is when you are placed in a hostile and stressful environment it's not easy to shake off especially when you are suffering from depression, post traumatic stress disorder as for Mrs Rachel, Mrs. Ana and myself. In fact I have two approved workmens compensation claim that's job related and the Medical Record Division continue down the same old path with reprisal, creating a hostile work environment, defaming subordinates character, religious discrimination & which included two crosses with the crusifix above her door. This complaint comes down to one issue the three of us participating in a sexual harrsssment complaint in which one was the victim. I thought the EEO Office job was to protect our rights and at the time we thought we were participating in protected activity which later we found out we were not.

Thanks


-----Original Message-----
From: Brown, Tammi M Ms WRAMC-Wash DC
Sent: Monday, November 05, 2007 7:17 AM
To: Rucker, Linda R Ms WRAMC-Wash DC
Cc: Alago-Toro, Ana R Ms WRAMC-Wash DC; Pizarro-Oquendo, Rachel Ms WRAMC-Wash-DC
Subject: RE: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Defamation Of Character & Job Harassment (UNCLASSIFIED)

Classification:  UNCLASSIFIED
Caveats: NONE

Classification:  UNCLASSIFIED
Caveats: NONE

Classification:  UNCLASSIFIED
Caveats: NONE

Ms. Rucker

As I have repeatedly tried to explain to you there are two types of complaints, individual and class.  A class is a group of employees, former employees or applicants who, it is alleged, have been or are being adversely affected by an agency personnel management policy or practice that discriminates against the group on the basis of their RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE OR DISABILITY (please refer to chapter 6 of AR 690-600).

While you in fact did submit a letter to this office on June 5, 2007 in regards to filing a class action, when I met with the three of you on June 13, 2007 I informed the three of you of the requirements for filing a class and a individual complaint. You cautioned the other two individuals that the three of you should consult an attorney before proceeding.

On July 19, 2007 I met with the three of you. You informed me that the three of you had consulted with an attorney who advised you that you could file as a group.  I, in turn explained thoroughly, the procedures for filing both types of complaints. The three of you each decided to pursue individual complaints. I also informed the three of you that you would each receive separate docket numbers and each of you would separately, go through the informal process.

2

I also advised the three of you that there was a possibility that the three complaints MAY BE consolidate at the investigative stage if they involved similar allegations or related to the same matter, every one agreed to pursue individual complaints.

All three of you individually went through the informal process and all three of you were provided a separate notice of the right to file.

On July 25, 2007 after signing your notice of right to file you stated that YOU wished to pursue the class complaint. I advised you that you cannot go back and file a class complaint on the same issue you decided to file an individual complaint on. I also read, verbatim, section 6-1 of AR 690-600 to you.

In sum, each of you CHOSE to pursue individual complaints and chose to file separate formal complaints and each case will be processed accordingly.

Tammi Brown
WRAMC EEO Specialist
202-782-4633
-----Original Message-----
From: Rucker, Linda R Ms WRAMC-Wash DC
Sent: Friday, November 02, 2007 10:00 AM
To: Brown, Tammi M Ms WRAMC-Wash DC
Cc: Dickenson, Thomas F Mr WRAMC-Wash DC
Subject: Reference To EEO Complaint Of Reprisal, Religious Discrimination, Hostile work Environment, Deformation Of Character & Job Harassment (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE


Dear Mrs. Brown,( Walter Reed EEO Counselor)

Complaint Of Discrimination Against : SFC Tania Davis O'neal & Mrs Julie Sherman

In review of the letters we received in reference to our complaint of Discrimination, As the spokes person for the group we have called attention to Walter Reed's EEO office on several occasions that we would be filing the complaint as a group. As you know we were infomed by Passman & Kaplan in a paid consultation and highly acknowleged Lawyers in Labor Discrimination advised us we could file as a group if circumstances are similar sitiuated we made contact with the WRAMC EEO Office on 5 June 2007 at that time we infomed the EEO Office that we had participated in a Sexual Harassment Complaint and that one of us was the victim.  On 7 June 2007 When SFC Davis O'neal did infact in my office go over my head and questioned the employee causing the Employee to feel SFC Davis was singleing her out and at that time a large disturbance started that spilled over in to Mrs. Sherman's office (Chief MRAD) at some point Mrs. Sherman had to pull SFC Davis o'neal back. This same day Mrs. Sherman came over to the Inpatient Record Section & and sprayed something from a clear bottle saying the words "she was going to drag the devil out of here" as if she was performing some ritual. The Inpatient Record Section was the only section sprayed.

Further more the employees involved in the complaint as myself went to MSG Smith about SFc Davis " his response was what do you want to happen to Mrs. Rucker" I am not the male employees who kissed the female employees feet. How can you turn that type of complaint arround on the Supervisor, who contacted EEO for guidance.

A hostile & stressful environment aggrivates known mental medical conditions & created new ones, it has also effects office morale and production. We will once again present the facts and dates supporting our case of discrimination for participating in protected activity in the investigation of a sexual harassment complaint. The above dates and times is just a few of documented information we haved inviolving our complaint.

3

MCHL-PAD-MR                                30 November 2007

SUBJECT:  Continued Reprisal, Disrespect For Me As A Supervisor And As A Person

Medical Records Division managers continue their abuse of me as a supervisor and a person.  I am the only Supervisor in Medical Record Division that is not allowed to select their Staff.  Since I know the job and I am in the trenches why am I treated so differently than other Supervisor's.  However when they need disciplinary action done then I am the Supervisor again.

Why would the a GS-13 & GS-11 feel it necessary to select my Staff one GS-6 & GS 5's  I could see if this was the practice across the board but it's not.  I know my job I respect Management but yet I am treated very differently.  Medical Record Division has a history treating some people illegally.

This type of treatment is stressful to me why can't I check on my Staff and run my office accordingly.  There are other sections where people are really not getting the job done but that's ok.  My Staff respect me and they work with me to get the job done, what more can Management ask.

LINDA RUCKER
Supervisor,
Clinical Records

12 DECEMBER 2007

CERTIFICATE OF SERVICE:

WE DO HEARBY CERTIFY THAT A COPY OF THIS COMPLAINT WAS
MAILED TO:


UNITED STATES DISTRICT ATTORNEY'S OFFICE
CIVIL DIVISION
555  FOURTH ST. N. W.
WASHINGTON, D. C.   20530

*H*
*RBW*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

*Rachel Oquendo, et al*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __88888__
(EXCEPT IN U.S. PLAINTIFF CASES)

*Pro Se N/P*

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

## DEFENDANTS

*Peter Green, et al*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Case: 1:08-cv-00032
Assigned To : Walton, Reggie B.
Assign. Date : 1/7/2008
Description: Employ. Discrim.

*JURY ACTION*

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
    Plaintiff

■ 2 U.S. Government
    Defendant

☐ 3 Federal Question
    (U.S. Government Not a Party)

☐ 4 Diversity
    (Indicate Citizenship of Parties
    in item III)

## III CITIZE...

FOR PLAINTIFF... AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
    Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other)   OR   ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
    defendant
☐ 871 IRS-Third Party 26
    USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of
    Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
    Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
    Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt
    Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
    Exchange
☐ 875 Customer Challenge 12 USC
    3410
☐ 900 Appeal of fee determination
    under equal access to Justice
☐ 950 Constitutionality of State
    Statutes
☐ 890 Other Statutory Actions (if not
    administrative agency review or
    Privacy Act

③

| ☐ **G.** *Habeas Corpus/ 2255* | ☒ **H.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530** Habeas Corpus-General<br>☐ **510** Motion/Vacate Sentence | ☒ **442** Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895** Freedom of Information Act<br>☐ **890** Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152** Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710** Fair Labor Standards Act<br>☐ **720** Labor/Mgmt. Relations<br>☐ **730** Labor/Mgmt. Reporting & Disclosure Act<br>☐ **740** Labor Railway Act<br>☐ **790** Other Labor Litigation<br>☐ **791** Empl. Ret. Inc. Security Act | ☐ **441** Voting (if not Voting Rights Act)<br>☐ **443** Housing/Accommodations<br>☐ **444** Welfare<br>☐ **440** Other Civil Rights<br>☐ **445** American w/Disabilities-Employment<br>☐ **446** Americans w/Disabilities-Other | ☐ **110** Insurance<br>☐ **120** Marine<br>☐ **130** Miller Act<br>☐ **140** Negotiable Instrument<br>☐ **150** Recovery of Overpayment & Enforcement of Judgment<br>☐ **153** Recovery of Overpayment of Veteran's Benefits<br>☐ **160** Stockholder's Suits<br>☐ **190** Other Contracts<br>☐ **195** Contract Product Liability<br>☐ **196** Franchise | ☐ **441** Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ Multi district Litigation | ☐ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*42 USC 2000e*

## VII. REQUESTED IN COMPLAINT

CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23      DEMAND $      Check YES only if demanded in complaint
JURY DEMAND: ☒ YES      ☐ NO

## VIII. RELATED CASE(S) IF ANY

(See instruction) ☐ YES ☐ NO      If yes, please complete related case form.

DATE *1-7-08*      SIGNATURE OF ATTORNEY OF RECORD *VCD*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.